525 P.2d 876

Erlinda APODACA, James Duane Ames, Anita Edmon, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,

v.

Richard WILSON, City Manager, Montrose Simms, Assistant City Manager, and John Apodaca, Supervisor of Customer Accounting, Individually and as those responsible for water and sewer service charge collections for the City of Albuquerque; Harry E. Kinney, Ray Baca, Nancy Koch, Louis Saavedra and Robert Poole, Individually and as members of the City Commission of the City of Albuquerque; their agents, employees and successors, Defendants-Appellees.

No. 9586.

Supreme Court of New Mexico.
Aug. 23, 1974.

William G. Gilstrap, Peter C. Mallery, Stephen G. Durkovich, Albuquerque, for plaintiffs-appellants.

Rodey, Dickason, Sloan, Akin & Robb, William C. Schaab, Albuquerque, Frank Mims, Asst. City Atty., Albuquerque, for defendants-appellees.

## OPINION

MONTOYA, Justice.

On August 2, 1971, the Albuquerque City Commission adopted Ordinance 102–1971 which increased sewer and water service charges over those charged under the superseded ordinance. On the same day, the City Commission adopted Budget Resolution No. 2, where by its terms, the City requests approval by the Attorney General and the Department of Finance and Administration for budget transfers and increases enumerated in schedules attached to the resolution. The schedules indicated that water and sewer revenues increased by the amount of $1,505,233, and that from such amount $1,129,903 was to be appropriated to the general fund of the City and appropriated from the general fund to cover budget increases for various departments of the municipality.

Plaintiffs Apodaca, Ames and Edmon filed a complaint against the City of Albuquerque and its agents (City) on January 14, 1972, on behalf of themselves and all others similarly situated, seeking to enjoin the City from collecting increased sewer and water service charges under the city ordinance. The plaintiffs also sought an order invalidating City Ordinance 102–1971 as being in violation of state law and the New Mexico Constitution, and directing the refund of any service charges previously collected under the ordinance. Subsequently, the Albuquerque Consumer Federation and New Mexico Taxpayers Association intervened as party-plaintiffs, seeking the same relief as the original plaintiffs.

On May 12, 1972, the court, sitting without a jury, dismissed plaintiffs' complaint and entered judgment for the City. This appeal ensued.

Plaintiffs advance five contentions seeking reversal of the trial court's decision. First, they argue that Ordinance 102–1971 violated New Mexico law. Article X of the New Mexico Constitution was amended by the adoption of § 6 on November 3, 1970. This section, known as the municipal home rule amendment, states in pertinent part:

"D. A municipality which adopts a charter may exercise all legislative powers and perform all functions not expressly denied by general law or charter. This grant of powers shall not include the power to enact private or civil laws governing civil relationships except as incident to the exercise of an independent municipal power, nor shall it include the power to provide for a penalty greater than the penalty provided for a petty misdemeanor. No tax imposed by the governing body of a charter municipality, except a tax authorized by general law, shall become effective until approved by a majority vote in the charter municipality.

"E. The purpose of this section is to provide for maximum local self-government. A liberal construction shall be given to the powers of municipalities. (As added November 3, 1970.)"

Pursuant to art. X, § 6, the charter of the City of Albuquerque was amended at a special election on June 29, 1971, to adopt the home rule powers set out above. Thereafter, the City adopted Ordinance 102–1971.

Plaintiffs argue that §§ 14–26–4 and 14–25–2, N.M.S.A., 1953 (Repl. Vol. 3, 1968), set out the limitations which are to be adhered to by the City in the formulation of any service charge rates. Section 14–26–4, supra, states in pertinent part that:

"A municipality owning and operating a water utility may:

"A. A municipality, for the purpose of maintaining, enlarging, extending, constructing and repairing water facilities, and for paying the interest and principal on revenue bonds issued for the construction of water facilities, may levy, by general ordinance, a just and reasonable service charge, * * * [.]"

Section 14–25–2(A), supra, provides that:

"A. A municipality, for the purpose of maintaining, enlarging, extending, constructing and repairing sewage facilities, and for paying the interest and principal on revenue bonds issued for the construction of sewage facilities, may levy, by general ordinance, a just and reasonable service charge, * * * [.]"

The initial hurdle then is whether the City's rate increase (Ordinance 102–1971) is to be confined by the limitations set forth in §§ 14–26–4 and 14–25–2(A), supra, or whether by virtue of its home rule status, compliance with these statutes is not required.

Article I of the Albuquerque City Charter provides as follows:

"The municipal corporation now existing and known as the City of Albuquerque shall remain and continue to be a body corporate and may exercise all legislative powers and perform all functions not expressly denied by general law or

charter. Unless otherwise provided in this charter, the power of the City to legislate is permissive and not mandatory. If the City does not legislate, it may nevertheless act in the manner provided by law. The purpose of this charter is to provide for maximum local self-government. A liberal construction shall be given to the powers granted by this charter."

The provisions of N.M. Const., art. X, § 6, and art. I of the City Charter enable the City, as a municipal corporation, to exercise all legislative powers and to perform all functions not expressly denied by the City Charter or general state law.

This case involves the first interpretation to be made by this court of the constitutional amendment conferring "home rule" upon municipalities in New Mexico who have adopted a city charter under the authority of such constitutional amendment.

The pertinent provisions of such amendment, N.M. Const., art. X, § 6(D), enable the City as a municipal corporation to "exercise all legislative powers and perform all functions not expressly denied by general law or charter." Subsection (E) of the amendment states that its purpose is to provide for maximum self-government, and that a liberal construction shall be given powers of municipalities.

Other jurisdictions having home rule, through either constitutional authority or legislative enactment, have considered the question of the extent of home rule power. Broadly stated, it is of considerable significance to municipalities as being first, a source of municipal power and second, as a limitation upon legislative control. Its effect as a source of such municipal power varies greatly in those states having adopted home rule. An excellent statement as to the purpose of such a constitutional amendment was made by the California Supreme Court in Fragley v. Phelan, 126 Cal. 383, 387, 58 P. 923, 925 (1899), as follows:

" * * * . It was to prevent existing provisions of charters from being frittered away by general laws, which would repeal those provisions by implication. It was to enable municipalities to conduct their own business and control their own affairs, to the fullest possible extent, in their own way. It was enacted upon the principle that the municipality itself knew better what it wanted and needed than did the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs. * * * "

In commenting upon the interpretations placed on home rule powers, Antieau in Vol. 1, Municipal Corporation Law, Home Rule § 3.03 at 100 (1973), says the following:

"The California Constitution in section 8 of article XI reads: 'It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general law.' Section 11 of the same article provides: 'Any county, city, town or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws.' Washington's Constitution is the same, and Idaho's would be identical but, as in some other home rule states, the comma after 'local' is omitted. Quite similarly, Utah's Constitution reads: 'Each city forming its charter under this section shall have, and is hereby granted, the authority to exercise all power relating to municipal affairs, and to adopt and enforce within its limits, local police, sanitary and similar regulations not in conflict with the general law.' It should be perceived that the language of these con-

stitutional provisions could hardly be any broader. * * *"

It would appear that the grant of power under the California amendment is as broad as the New Mexico amendment, which permits municipalities in our state to "exercise all legislative powers and perform all functions not expressly denied by general law or charter." '

There is no question that by the terms of the amendment the charter provisions are self-executing in the sense that no further legislative act is necessary. In interpreting the power of Texas municipalities to regulate under the Texas home rule amendment, which contains the clause that it is "subject to such limitations as may be prescribed by the legislature," the Texas Court of Civil Appeals, in Pitre v. Baker, 111 S.W.2d 359, 361 (Tex.Civ.App.1937), said:

> " * * *. Prior to the adoption of the home rule amendment, cities and towns looked to the general laws of the state for their power to act, and they had no power not granted them by law. The home rule amendment changed that principle of law, and home rule cities now have all power not denied them by the Constitution and general statutes; the distinction is this—before the adoption of the home rule amendment, cities and towns were compelled to point out the authority to act in the grant given them by the Legislature; since the adoption of the amendment, cities and towns look to the Constitution and general laws, not for specific grants of power, but to ascertain whether or not a specific power is denied them. * * *"

■ An example of such specific denial of power is contained in § 72–4–1.1, N.M. S.A., 1953 (Repl. Vol. 10, pt. 2, 1973 Pocket Supp.) whereby, unless otherwise provided by law, municipalities are prohibited from imposing an income tax or an ad valorem property tax, and then, with some exceptions, are authorized to levy certain excise taxes if the ordinance imposing such a tax is approved by the majority vote in the

municipality. We believe that in New Mexico, as in Texas, a home rule municipality no longer has to look to the legislature for a grant of power to act, but only looks to legislative enactments to see if any express limitations have been placed on their power to act. To adopt any other interpretation in New Mexico would make the home rule amendment meaningless.

■ We now turn to the argument advanced by plaintiffs, that §§ 14–26–4 and 14–25–2, supra, set forth the criteria which the City must follow in establishing rates, and that the funds received therefrom can only be used for system costs, including maintenance, construction, enlargement and repair of the system facilities, and to pay the principal and interest on revenue bonds issued for construction of the system. This contention by plaintiffs might be valid in the absence of the home rule amendment. There is nothing in either of these two statutes that in any way limits or prohibits the application of the revenues from the sewer or water system operated by the City to other municipal purposes. Under the authority of the home rule provisions of our Constitution, and in accordance with the provisions of the City Charter, the City legislated by passing an ordinance increasing the charges for both services. The only limitation, as in the case of any legislative action or function by the City, is that it exercise its authority in a reasonable manner and act pursuant to constitutional authority.

■ We need to determine what is meant by the clause "not expressly denied by general law or charter." In this contention, it may be stated that the term "general law" can only be interpreted to mean a law that applies generally throughout the state, or is of statewide concern as contrasted to "local" or "municipal" law. The words "not expressly denied" must be given some meaning, and we take it to mean that some express statement of the authority or power denied must be contained in such general law in order to be applicable, as in § 72–4–1.1, supra, or oth-

erwise no limitation exists. It has been stated that under home rule powers, to control or limit municipal enactments, the general law must be of general concern to the people of the state. We believe the Supreme Court of the State of Oregon ably stated the proper rule, which we adopt, in the following language:

"While a general law supersedes a municipal charter or ordinance in conflict therewith, it should be borne in mind that the subject matter of the general legislative enactment must pertain to those things of general concern to the people of the state. A law general. in form cannot, under the Constitution, deprive cities of the right to legislate on purely local affairs germane to the purposes for which the city was incorporated."

City of Portland v. Welch, 154 Or. 286, 296, 59 P.2d 228, 232 (1936). Again in the same case, the court in further discussing home rule powers, said:

"In McQuillan, Municipal Corporations (2d. Ed.) § 93, it is said: 'The purpose (referring to the home rule amendments) was to give local communities full power in matters of local concern, that is, in those matters which peculiarly affected the inhabitants of the locality, not in common with the inhabitants of the whole state. Those matters which affected all of the inhabitants of the state were viewed as state matters, and therefore subject to state control, but those things which did not concern inhabitants of the state other than those residing in the particular community, were sought to be differentiated as local concerns, which under these constitutional provisions were to be regarded as exclusively matters of local self-government, or home rule for control alone by the local inhabitants in any manner which seemed to them desirable, not inconsistent with the general laws and policy of the state.'"

It is to be observed that there is some uncertainty in court decisions as to when an enactment of the legislature is of statewide concern. The Arizona Supreme Court noted in City of Tucson v. Arizona Alpha of Sigma Alpha Epsilon, 67 Ariz. 330; 336, 195 P.2d 562, 566 (1948):

"* * *. A perusal of cases from other jurisdictions indicates that there is a twilight zone wherein it is difficult to discern with positive assurance that legislation is of general concern, or is merely of local or municipal concern. * * *"

However, the Arizona Supreme Court had indicated the test to be applied is whether or not the performed activity is proprietary. In City of Tucson v. Tucson Sunshine Climate Club, 64 Ariz. 1, 8, 164 P.2d 598, 602 (1945), the court expressed itself as follows:

"* * *. The courts differ as to what activities of the city are of local interest or concern and therefore free from legislative interference. Some of such activities are so noticeably local or state-wide that they are easily assignable, while in others the line of demarcation is very difficult of discernment, because the activity may be neither predominantly local nor state-wide but may partake of both. Whether it is one or the other in such case depends upon whether the activity is carried on by the municipality as an agent of the state. If it is, it is of general or public concern. If it is exercised by the city in its proprietary capacity, it is a power incidental to home rule. * * *"

While judicial interpretation may be necessary as to the meaning of "municipal affairs" in many cases, the instant case presents no problem in that regard. It is clear that the City was acting in a proprietary capacity in operating its sewage and water systems. In Southern Union Gas Company v. City of Artesia, 81 N.M. 654, 657, 472 P.2d 368, 371 (1970), this court stated:

"* * *. The operation of its water and sewer system is a proprietary function of the defendant city, and not a

governmental function, which operation cannot be validly distinguished from the proprietary operation by plaintiff of its gas system. [Citations omitted.] Both must stand on the same footing, * * * ."

Of what concern is it statewide what the City's users of those systems must pay for such service and how the monies derived from them are to be expended?

Moreover, it has been held that the management of municipally-owned utilities is a local affair which home rule municipalities control rather than state legislation. The supplying of water to its population has been determined to be a municipal affair in home rule municipalities in both California and Oklahoma. In those states it was decided that state law had no application to rates to be charged or the application of revenues derived therefrom. See *City of Pasadena v. Charleville*, 215 Cal. 384, 10 P.2d 745 (1932); *Pitts v. Allen*, 138 Okl. 295, 281 P. 126 (1928).

In New Mexico, N.M.Const., art. IX, § 13, authorizes contracting of debts for the construction or purchase of a system for supplying water, or of a sewer system for cities, and authorizes the limitation imposed by that section may be exceeded for such purposes. Legislative enactments authorizing such activities are contained in § 14–22–5, N.M.S.A., 1953 (Repl. Vol. 3, 1968).

In support of their position that the City lacks power to apply sewer and water system revenues for general governmental purposes, plaintiffs rely on *City of Cincinnati v. Roettinger*, 105 Ohio St. 145, 137 N.E. 6 (1922). That case is clearly distinguishable on two grounds. First, the charter of the City of Cincinnati contains the following provision (105 Ohio St. at 159–160, 137 N.E. at 10):

" 'All legislative power of the city shall be vested in council, subject to the general and all local or special laws enacted by the General Assembly of the state of Ohio, now in force, relating to the organization and government of cit-

ies and their officers, and defining and limiting their powers and duties in so far as they apply to the city of Cincinnati, which laws are hereby adopted and continued in force as the charter of our city, except as herein amended or supplemented.' "

Second, the Ohio Supreme Court held that § 3959, General Code, is constitutional, and operates as a valid limitation upon the uses and purposes for which revenues derived from municipally owned waterworks may be applied. By virtue of the provisions of that section, surplus revenues derived from water rents may be applied *only* to repairs, enlargement or extension of the works, or of the reservoirs, and to the payment of the interest of any loan made for their construction, or for the creation of a sinking fund for the liquidation of the debt. We have no comparable statute in New Mexico limiting the use of utility system funds in the manner that the Ohio statute specifically restricts the use of waterworks revenues by a municipality. Plaintiffs overlook the ruling by the same Ohio Supreme Court in City of Niles v. Union Ice Corporation, 133 Ohio St. 169, 12 N.E.2d 483 (1938), which held that funds derived from the city-owned electric utility can be used for general governmental purposes. We consider § 14–22–4, N.M.S.A., 1953 (Repl. Vol. 3, 1968), which authorizes municipalities to transfer to the general fund income derived from the operation of a city-owned utility that has funds derived from revenue bonds, after paying expenses for maintenance and deposit of 125% of the interest and sinking fund requirements for that current year, to be dispositive of the issue in New Mexico. This statute by its terms is permissive and the City not having legislated on the subject can certainly take advantage of its permissive authority.

Plaintiffs also contend that "the City's sewer and water rate increase is not a just and reasonable service charge," arguing that the charges in order to be so classified must be measured in terms of what is required for maintaining, extend-

ing, enlarging the systems, and paying principal and interest on revenue bonds, as provided in §§ 14–25–2 and 14–26–4, supra. We have already discussed the effect of the home rule amendment on those statutes and how they contain no express denial of authority to the City to fix water and sewer rates based only on the criteria provided by those statutes. We do, however, agree that the rates must be reasonable.

Admittedly, here the rates fixed by the ordinance produced more revenue than needed to satisfy the cost of operating the system and the requirements for the payment of principal and interest on revenue bonds issued. The proper general rule to be applied here is that the City, by owning and operating its water and sewer system, is acting in a business or proprietary capacity rather than in a governmental capacity. Therefore, the obligations resting upon it are identical to those of a private utility company operating under a municipal franchise, insofar as the determination of the reasonableness of its rates is concerned. In Holton Creamery Co. v. Brown, 137 Kan. 418, 420–421, 20 P.2d 503, 504–505 (1933), the Supreme Court, in a case involving the excessiveness of rates imposed by the city operating its own utility, quoted the following with approval:

> "In 5 McQuillin's Municipal Corporations (2d Ed.) 64, 65, it is said: 'Where a municipality owns its water or light works, it is settled that it has the right to charge rents against consumers who make use of its service. However the rates must be reasonable, although the municipality may charge a rate which will yield a fair profit, and need not furnish the supply or service at cost; and the same rules in regard to the reasonableness of rates apply as in case of the rates of private companies owning a public utility. Otherwise stated, where the municipality owns its plant, the rates for water, light or any other product, furnished by it must be fair, reasonable

and just, uniform and nondiscriminatory.'"

See also Raton Public Service Company v. Hobbes, 76 N.M. 535, 417 P.2d 32 (1966); McMurtry v. City of Raton, 66 N.M. 277, 347 P.2d 168 (1959); City of Niles v. Union Ice Corporation, supra; Shirk v. City of Lancaster, 313 Pa. 158, 169 A. 557 (1933); Twitchell v. City of Spokane, 55 Wash. 86, 104 P. 150 (1909). There was evidence at trial as to the reasonableness of the rate increases and as to the fact that Albuquerque rates compared favorably with amounts received by private utility companies. We note that § 14–17–1(H), N.M.S.A., 1953 (Repl. Vol. 3, 1968, 1973 Pocket Supp.), specifically gives a municipality power to—

> "H. establish rates for services provided by municipal utilities and revenue-producing projects, including amounts which the governing body determines to be reasonable and consistent with amounts received by private enterprise in the operation of similar facilities."

Although the instant case was filed prior to June 1972, the effective date of this statute, it expresses current legislative policy and is consistent with our holding as to the City's power to set reasonable rates in excess of actual expenditures in furnishing municipally-owned utility services, if such rates compare favorably with those received by private utility companies. The trial court, in its finding No. 23, stated:

> "The City's water and sewer rates as increased by Ordinance 102–1971 are just and reasonable, fair and equitable."

This finding is supported by substantial evidence.

We next consider plaintiffs' second contention, that the sewer and water service charge increase is a tax and, as such, is in violation of law and the New Mexico Constitution. The home rule amendment provides that the City may not impose a tax until approved by a majority vote, excepting therefrom a tax authorized by general law. In addition, the Charter Municipality

Tax Act, § 14–14–1, N.M.S.A., 1953 (Repl. Vol. 3, 1968, 1973 Pocket Supp.), under its temporary provisions in force when Ordinance 102–1071 was adopted, prohibited any charter municipality from adopting any tax to become effective July 1, 1973, unless such tax was authorized by general law. We have heretofore made reference to the provisions of § 72–4–1.1 limiting the tax powers of home rule cities. The question to be resolved is whether the increased sewer and water charges can be construed to be a tax. In City of Clovis v. Crain, 68 N.M. 10, 16, 357 P.2d 667, 671, 88 A.L.R.2d 1250, 1259 (1960), where the collection of garbage and sewer assessments was in question, we said:

"Rhyne, Municipal Law, § 20–5, p. 462, states the rule as follows:

" * * *.

" 'It is the majority rule that sewer service charges are neither taxes nor assessments, but are tolls or rents for benefits received by the user of the sewer system; * * *.' "

Here, plaintiffs again rely on City of Cincinnati v. Roettinger, supra, in support of their position, contending that water or sewer charges become a tax when the revenues or a portion thereof are used for general governmental purposes. We disagree with the conclusion reached in the Roettinger case, and agree with the Ohio Supreme Court's later decision in City of Niles v. Union Ice Corporation, supra, when it said (133 Ohio St. at 181–183, 12 N.E.2d at 488–489):

"Appellants further contend that if a municipal utility is permitted to charge a rate in excess of the cost of furnishing the service or product, and if such excess were used to finance the cost of municipal government, that such excess, so used, would assume the nature and be used in lieu of taxes and the municipality would thereby be enabled to evade the constitutional limitations upon its power of taxation, and that municipalities would be free to impose the cost of mu-

nicipal government upon the consumers of light and power.

"This contention proceeds on the theory that a municipality has no right to charge for its utility service or product a rate in excess of cost, i. e., that it has no right to make a profit. Nevertheless, we are not referred to any statute or constitutional provision denying this right. In the absence of such prohibition, a municipality, no less than a private corporation engaged in the operation of a public utility, is entitled to a fair profit. In the operation of a public utility, a municipality acts, not in a governmental capacity as an arm or agency of the sovereignty of the state, but in a proprietary or business capacity. 9 Ruling Case Law 1232, § 38. In its proprietary capacity it occupies the same 'posture' as that occupied by a private corporation engaged in business, [Citations omitted.].

" * * *.

"The rate charged in excess of cost is not a tax or in the nature of a tax, regardless of how the fund derived therefrom is ultimately used. A municipality, acting in a proprietary capacity, cannot impose taxes. While thus engaged, it is engaged in business but not in the business of government. A municipality may impose and collect taxes only when acting as an arm or agency of the state, but when engaged in business, it does not so act. A tax is a tribute levied for the support of government. 38 Ohio Jurisprudence 714, § 3. A rate charged for a public utility service or product is not a tax, but a price at which and for which the public utility service or product is sold, [Citations omitted.] * * *.

"Since the rate charged is not a tax in its inception, ultimate use of surplus funds derived therefrom for the support of municipal government will not convert it into taxes or cause it to assume the nature of taxes."

Likewise, in Twitchell v. City of Spokane, supra, the Supreme Court of Wash-

ington passed on this very point and disposed of it in the following language (55 Wash. at 89, 104 P. at 151):

"*  *  *. It is claimed that the rate charged amounts to an excessive tax on the community. But water rates are not taxes. The consumer pays for a commodity which is furnished for his confort and use. The rule is stated in 30 Am. & Eng.Enc.Law (2d Ed.) p. 422, as follows: 'Water rents paid by consumers are in no sense taxes, but are nothing more than the price paid for water as a commodity. The obligation to pay for the use of water rests either on express or implied contract on the part of the consumer to make compensation for water which he has applied for and received.' [Citation omitted.]  *  *  *."

■ We therefore hold that the water and sewer charges in the instant case are not "taxes" irrespective of the application of the revenues derived from such charges.

■ The next point advanced by plaintiffs is that the approval of the Attorney General and the Director of Finance and Administration is required before revenues generated from the increased service charges can be used for a budget increase under the provisions of § 11–2–57(H), N. M.S.A., 1953 (Repl. Vol. 2, pt. 2, 1974). The City contends that this statute does not prohibit the home rule City's powers to transfer revenues and increase or decrease its budget without regard to state approval, and then argues that Ordinance 102–1971 and Budget Resolution No. 2 were adopted in exercise of home rule powers.

The City's Charter, by the terms of art. I, states the City—

"may exercise all legislative powers and perform all functions not expressly denied by general law or charter. Unless otherwise provided in this charter, the power of the City to legislate is permissive and not mandatory. If the City does not legislate it may nevertheless act in the manner provided by law. *  *  *"

We have held that Ordinance No. 102–1971 was proper legislation by the City. Assuming that Budget Resolution No. 2 can be considered legislation to implement the appropriation of the monies raised by the Ordinance, the Budget Resolution, by its very terms, requests approval of the Attorney General and the Department of Finance and Administration. In the present posture of the case, we can only say that the City is bound by its own resolution in requesting such approval, since it proceeded to "act in the manner provided by law." The Resolution is the only official action by the City, other than the Ordinance itself that is before us, and we cannot change its wording or effect. However, it is evident that approval of budget increases was withheld by the Attorney General and action deferred by the Department of Finance and Administration under the mistaken opinion that the budget increases were illegal because not authorized by statute, and on the further ground, as stated in Attorney General's brief submitted to the trial court, that the rate increases were illegal because they constituted a tax promulgated in violation of N.M.Const., art. X, § 6. Those two grounds have been decided in this opinion as not being correct. Furthermore, the City had properly met the standards set out in § 11–2–57(H), supra, which reads as follows:

"H. With written approval of the director of the department of finance and administration and the attorney general, increase the total budget of any local public body in the event such local public body undertakes an activity, service, project or construction program which was not contemplated at the time the final budget was adopted and approved and which activity, service, project or construction program will produce sufficient revenue to cover such increase in the budget or such local public body has surplus funds on hand not necessary to meet the expenditures provided for in the budget with which to cover such increase in the budget."

Accordingly, approval by the Attorney General and the Department of Finance and Administration should have been granted, and the City is not to be precluded from using the revenues realized under Ordinance 102–1971, as provided in the schedules attached to Budget Resolution No. 2.

Under the circumstances present herein, and the terms of Budget Resolution No. 2, we are not prepared to hold that the trial court was correct in its conclusion No. 16, which reads:

"16. Approval of any transfer of funds from the City of Albuquerque's Joint Water and Sewer Fund to its General Fund, or of any increase in the City's total budget, is not required by Section 11–2–57 G or H, NMSA 1953. The Department of Finance and Administration does not under that Section have power to control the budgets or fiscal affairs of home rule municipalities."

In view of the disposition we have made of the applicability of § 11–2–57(H), supra, the question of control needs no further discussion.

The fourth point argued by plaintiffs is that the home rule amendment does not apply to the issues of this case. The discussion under the previous points raised by plaintiffs has resolved the issue raised under this point. The same disposition applies to the fifth point raised by plaintiffs, that injunctive relief is proper in this case.

In view of the foregoing, the decision of the trial court is affirmed, excepting that portion of the decision holding that approval of the Attorney General and the Department of Finance and Administration was not required under the provisions of § 11–2–57(H), supra. The cause is remanded to the trial court with instructions to amend its decision in conformance with the view herein expressed, and to enter its judgment accordingly. No costs are to be assessed against plaintiffs in view of the order of the trial court declaring plaintiffs to be indigent.

It is so ordered.

McMANUS, C. J., and STEPHENSON, J., concur.