HAYMES ET AL., APPELLEES, *v.* HOLZEMER ET AL., APPELLANTS.

(No. L-80-400—Decided October 9, 1981.)

Mr. *William Moore* and Mr. *Willard Johnson,* for appellees.

Mr. *Paul Goldberg* and Ms. *Mary Trimboli,* for appellants.

CONNORS, P.J. This cause comes upon appeal from the granting of a motion for summary judgment in favor of plaintiffs-appellees by the Common Pleas Court of Lucas County, Ohio.

This cause of action arises from the billing procedure employed by the Board of Lucas County Commissioners for sewer service. Sewer charges were levied on certain landowners, the appellees herein, pursuant to County Resolutions 98, 99 and 100. Two types of charges are in issue. The first is a "tap-in" fee in the amount of $250 per dwelling unit. The second is a "user" charge in the amount of $132 per year per dwelling unit. Both charges stem from the construction of the Jerome Road sanitary sewage treatment plant and sanitary sewer 500 C, which presently service appellees, and a rather large area in the western portion of Lucas County.

Prior to the construction of the Jerome Road Plant, appellees were serviced by a package sewage treatment plant. A development company constructed the "package plant" at its expense, prior to the development of the subdivision in which appellees' property is located. The costs of the plant were passed on to the purchasers of the lots. On March 13, 1964, the developer and the Lucas County Commissioners agreed that Lucas County would assume ownership and operation of the package plant.

On June 10, 1970, the Board of Lucas County Commissioners (hereinafter referred to as board) enacted a resolution providing for the construction of a major waste water treatment plant at Jerome Road. This resolution was repealed on January 19, 1978, and in its place the county commissioners enacted Resolutions 98, 99 and 100 which, taken together, established regulations governing the operation of said Jerome Road plant and its tributaries, established charges for the use thereof, and established tap-in charges.

It was not until after construction of the new plant and connectors, when the effluent from the package plant was diverted to the connector and then into the Jerome Road Plant, that the county levied the tap-in and user charges enacted under Resolutions 98, 99 and 100 on the property in question. The appellee property owners objected to both charges and filed suit. The Common Pleas Court of Lucas County, in a judgment entry dated November 26, 1980, granted summary judgment in favor of appellees on the first two issues, the court holding that the Board of County Commissioners is prohibited by statute from levying a connection (tap-in) charge on property owners for the privilege of connecting into the county sewer system when such charges are utilized to recoup the cost of construction of the county's sewer system. The court also held that the board was statutorily prohibited from injecting a $7.74 amount into the user charge, such amount representing a monthly debt service charge used to assist in amortizing the cost incurred in the construction of the sewer and treatment facility. From this decision and judgment entry appellants now appeal.

Appellants' first assignment of error states the following:

"The trial court erred in holding that the tap-in charge levied on the plaintiffs was improper in that the Board of County Commissioners of Lucas County failed to follow the precise procedures specified in R.C. 6117.02."

R.C. 6117.02 states, in pertinent part:

"The board shall also establish reasonable charges to be collected for the privilege of connecting to the sewers or sewerage treatment or disposal works of the district with the requirement that,

*prior* to such connection, such *charges* shall either be *paid in full,* or, if determined to be equitable by the board in its resolution providing for the payment of such charges, provision deemed adequate by the board shall be made for payment in installments at such times and in such amounts and with such security, carrying charges, or penalties as may be found by the board in such resolution to be fair and appropriate, and no person shall be permitted to connect to the sewers or sewerage treatment or disposal works of the district *until such charges have been paid in full,* or until such provision for payment in installments has been made. * * *'' (Emphasis added.)

In the instant case, the trial court held that the tap-in charge levied on the appellees was improper under R.C. 6117.02, the court stating that R.C. 6117.02 "provides that *prior* to the tap-in the charge shall be paid in full or the county may provide for an installment payment procedure by provision in its resolution * * *. It is apparent that the Board made no payment collection arrangement *prior* to the tap-in * * *. The Board's failure to comply with the strict mandate of O.R.C. 6117.02 renders the tap-in fee improper in this case.''

The trial court's findings are supported by the case of *Parente* v. *Day* (1968), 16 Ohio App. 2d 35 [45 O.O.2d 321]. In *Parente,* the County Commissioners of Cuyahoga County adopted a resolution which authorized construction of a sewage treatment plant and created an assessment district in the city of Brecksville. Four years later, after the tap-ins had been completed, the board of county commissioners, for the first time, established a schedule of tap-in charges for the homes owned by the plaintiffs. The plaintiff homeowners then petitioned the court to enjoin collection of the tap-in charges. The Cuyahoga County Court of Appeals held that the failure to follow the requirements of R.C. 6117.02 made the tap-ins improper and unlawful, for R.C.

6117.02 required that such charges be made at or prior to the time of the tap-in. See, also, *New Landing Utility* v. *Illinois Commerce Comm.* (1978), 58 Ill. App. 3d 868, 375 N.E. 2d 578.

Based on the clear language of R.C. 6117.02 and the case of *Parente* v. *Day, supra,* this court affirms the findings of the trial court, and appellants' first assignment of error is found not well taken.

Appellants' second assignment of error states:

"The trial court erred as a matter of law in holding that the tap-in charge is, in reality, an assessment.''

The trial court made the following findings:

"Even if the Court had found the Board in compliance with R.C. 6117.02, the tap-in fee could not be upheld as the present charge is, in reality, an assessment. R.C. 6117.02 also requires that the funds collected 'be used *first* for the payment of the cost of the management, maintenance, and operation' of the sewerage treatment plant, 'and *second* for the payment of interest or principal of any outstanding debt incurred for the construction' of the sewerage treatment plant. (Emphasis added.) Yet in County Resolutions 98 and 99 it is expressly provided that funds collected from the tap-in fee be *directly* applied to payment of the construction costs. See Exhibit 2 at 3 and 3 at 12. This contravenes R.C. 6117.02 which requires payment of operation and maintenance expenses first. * * * The Board argues that there is no language in R.C. 6117 where it specifically declares an assessment procedure as the sole means to pay construction costs. By implication, however, it is clear to the court that a tap-in charge is not proper in this case. * * * Thus, assessment was the appropriate procedure where the proceeds were to pay solely for the costs of construction.''

Hence, the trial court, in effect, ruled that the tap-in or connection charge is not the proper means to recoup the costs of

construction of the sewer system. Where it is attempted to recoup the costs of construction, the trial court ruled that the assessment procedure is the appropriate means.

However, R.C. 6117.02 states, in pertinent part:

"All moneys collected as rents for use of such sewers or sewerage treatment or disposal works or as *connection charges* in any sewer district shall be paid to the county treasurer and kept in a separate and distinct fund * * *. [S]uch funds shall be used *first* for the payment of the cost of the management, maintenance, and operation of the sewers of the district and sewerage treatment or disposal works used by the district and *second* for the payment of interest or principal of any outstanding *debt* incurred for the *construction* of such sewers or sewerage treatment * * *." (Emphasis added.)

Furthermore, R.C. 6117.02 continues in the following manner, the statute stating:

"No provision of this section shall limit or restrict the power and discretion of the board to determine how much of the cost of such improvements shall be borne by the county at large and how much shall be specially assessed upon benefited properties, nor the power to issue notes and bonds for the share to be borne by the county and in anticipation of the levy or collection of special assessments * * *."

Also, R.C. 133.05 indicates that debt service payments may be included as an increment in the sewer user charges imposed by a board of county commissioners. R.C. 133.06 permits the issuance of revenue bonds payable solely from rents and charges imposed for the use of sewage facilities. R.C. 133.24 permits the taxing authority of any subdivision to issue bonds for the purpose of acquiring or constructing any permanent improvements. Finally, R.C. 6121.13, providing for the method of repayment of loans to the Ohio Water Development Authority,

states that any governmental agency may provide the funds for the payment of such contribution as is required under such agreements by the levy of "taxes, assessments, or rentals and *other charges* * * *." (Emphasis added.)

This court will not attempt a review of the entire applicable Ohio Revised Code in order to establish the principle that connection charges can be used to recoup the costs of construction. There is no clear definitive language which defines this point. However, the Revised Code does make it clear that governmental authorities shall have as much leeway as possible in establishing fees and rates and in maintaining financing schemes to support such sewer systems. Such fees and rates must be reasonable, but the methods and manner of financing such systems are largely left with the authorities. Hence, the aforementioned sections, combined with the discretionary power given in the last passage of R.C. 6117.02, clearly allow the authorities the power to fashion reasonable methods of recouping the cost of constructions.

This court finds that, consistent with the discretionary authority given under the Revised Code it is permissible to use connection or tap-in charges to recoup the costs of construction without assessment procedures being implemented first. While, as stated previously, there is no clear definitive language on this point, R.C. 6117.02 does provide that monies collected as connection charges can be used for the payment of interest or principal for the construction of sewers after they have been used first for the payment of maintenance and operation of such sewers. From this, it may be inferred that the legislature intended that connection charges could be used to recoup the construction costs of sewers, and not that such charges could be used for construction costs only after maintenance and operation costs were paid.

Such a result is consistent with the case of *Amherst Builders* v. *Amherst*

(1980), 61 Ohio St. 2d 345 [15 O.O.3d 432], where the court upheld a tap-in or connection fee in an amount greater than the administrative costs of the tap-in. In making this decision, the court stated the following:

"There can be no doubt that, in order to exercise that power, a municipality must be able to impose charges upon the users of the system to defray the costs of both its construction and operation * * * When this unimproved land is developed, the tap-in charge is imposed so that these new users will now assume a fair share of the original construction costs." *Amherst, supra,* at 347.

The court in *Amherst* also addressed the question of whether the connection charge was a disguised "assessment," a point which appellees contend in the instant case. The court, in dismissing this contention, made the following comments:

"The court below determined that the tap-in charge was an 'assessment' as that term is used in R.C. 2723.03, so that appellant's failure to file a written protest with its payment of the fees precluded recovery of the fees, even if it had prevailed in having the ordinance invalidated. This conclusion disregards the fact that an assessment is normally levied against all property in the service area, unimproved as well as improved, while this fee is only imposed when a new user desires to connect to the sewer system.

"In *Stoeckle, supra* (161 Ohio St. 391 [53 O.O. 303]), at page 393, this court recognized this distinction, stating that 'the charge is not in fact a second assessment but * * * is a charge for permission to connect with the sewer * * *.' See, also, *State, ex rel. Gordon,* v. *Taylor* (1948), 149 Ohio St. 427, 434, declaring that '* * * it is well established that charges for sewer services * * * are neither taxes nor assessments.' " *Amherst, supra,* at 349-50.

Finally, it should be noted that other jurisdictions with similar statutes have had no problem in allowing connection fees to recapture the costs of construction. In the case of *Brooklyn Center* v. *Metropolitan Council* (1976), 306 Minn. 309, 243 N.W. 2d 102, the Minnesota Supreme Court upheld a formula whereby construction costs for a sewer system were recaptured by means of a connection fee for each building permit issued on new construction. Similarly, in *Hayes* v. *Albany* (1971), 7 Ore. App. 277, 490 P. 2d 1018, the court allowed connection fees to be directly implemented toward the costs of new sewer construction, the Oregon Appellate Court upholding the following provision:

"To establish appropriate provisions for the construction and expansion of the sanitary sewer system of the city, inclusive of the treatment plant, and to provide for the necessary oversizing of the sanitary sewer system, and to be assured that the cost of such construction and expansion is borne by those who receive the benefits thereof, there is hereby established connection charges for all connections made to the sanitary sewer system of the city in accordance with the following amounts * * *." *Hayes* v. *Albany, supra,* at 1018-1019.

Finally, in *Contractors & Builders Assoc.* v. *Dunedin* (1976), 329 So. 2d 314, the Florida Supreme Court upheld the raising of capital for the construction of municipal utilities through the use of connection charges, the court holding that a municipality may legitimately consider raising capital for future outlay in establishing its utility rates and charges. See, also, *Pontiac* v. *Mason* (1977), 50 Ill. App. 3d 102, 365 N.E. 2d 145; *Marriott* v. *Springfield Sanitary Dist.* (1976), 43 Ill. App. 3d 869, 357 N.E. 2d 666.

While of limited help in interpreting Ohio's own statutes on connection charges, such cases demonstrate that the use of connection fees to recoup the costs of construction is not unreasonable or arbitrary, as appellees contend. Nevertheless, based upon this court's inter-

pretation of R.C. 6117.02, and the applicable cases and statutes, this court finds that connection charges may be used to recoup the costs of construction without the need for the implementation of assessment procedures and charges. While the trial court was correct in stating that the assessment procedure under R.C. 6117.30 and 6117.31 is one method to recoup the cost of construction, the trial court erred in stating that the assessment procedure was the only appropriate method in the instant case to recoup such costs. Appellants' second assignment of error is, therefore, found well taken.

Appellants' third assignment of error states the following:

"The trial court erred as a matter of law in holding that the assessment provisions in Ohio Revised Code Sections 6117.30 and 6117.31 provide the exclusive procedure to directly recoup the cost of construction."

As already stated, this court holds that the connection charge is also a valid method to recoup the cost of construction. This court will not participate in an interpretation of the word "directly," and whether such connection fee "directly" or "indirectly" recoups the cost of construction, for the result is the same. However, a connection fee, according to this court's ruling, can be drawn so as to require new users to pay for the costs of construction, without the necessity of implementing assessment charges and procedures.

It should also be noted that the case of *Amherst Builders* v. *Amherst, supra,* recites an additional method to recoup the costs of construction. In the footnote, on page 347, the court stated that the financing of the construction cost is *usually* done through either special assessments or bond issue. However, in the instant case, no bonds were issued and no assessments were levied, hence these methods are not now in issue. This court makes no determination as to other alternative methods of financing construction

costs other than connection fees, user charges, assessments, or bonds, and we find that connection fees are an appropriate method to recoup construction costs in the instant case. Appellants' third assignment of error is found well taken.

Appellants' fourth assignment of error states the following:

"The court erred as a matter of law in finding that the legislature intended to prohibit the Board from injecting debt service amounts into the user charge."

The trial court, at page five of the opinion, held that:

"The user charge is limited, however, by the language requiring a reasonable rate. Thus, as plaintiffs correctly maintain, a surplus is not objectionable. Whatever sums are left after the payment of all operation and maintenance costs, may be used for debt service. This provision, however, cannot be construed as permitting the inclusion of debt service charges into the computation of the total user charge."

However, the legislative history mandates a different result. The provision of R.C. 6117.02, authorizing sewer user charges, was enacted in 1949 in substantially its present form, except that it provided that a board of county commissioners "may fix" instead of "shall fix" reasonable rates. (See G.C. 6602-1, [Am. H. B. No. 407, 123 Ohio Laws 441, 442-443].) The rate provisions of R.C. 6117.02 were then amended in 1957 by Am. H. B. No. 228 (127 Ohio Laws 622, 625) so as to make the following pertinent changes: (1) the "may fix reasonable rates" language became, "shall fix reasonable rates"; and (2) a sentence was added that, "Such rates shall be sufficient to pay the cost of the management, maintenance, and operation of the sewers of the district and sewerage treatment or disposal works used by the district and *at least* fifty per cent of all charges for interest and principal of any outstanding debt incurred for the *construction* of such sewers and sewerage treatment or dis-

posal works when due. * * *'' (Emphasis added.) The above provision of the 1957 amendment mandating the imposition of rates sufficient to pay at least fifty percent of the interest and principal requirements on debt incurred raised serious doubts as to the power to finance local improvements with special assessments, and, accordingly, a special session of the legislature was convened in 1958 to clarify the situation. The resulting 1958 amendment modified the statute to state the following:

"Such rates shall be *at least* sufficient to pay * * * all the cost of operation and maintenance of improvements for which the resolution declaring the necessity thereof shall be passed after the effective date of this act. * * *'' (Emphasis added.) (Am. H. B. No. 942, 127 Ohio Laws, Part II, 10, 12.)

The words, "at least," in the current statute were clearly intended to replace the deleted language of "at least fifty per cent of all charges for interest and principal of any outstanding debt incurred for the construction of such sewers * * *." Hence, the inclusion of "at least" clearly represented the legislature's intent to include debt service amounts for construction costs in the sewer user charges, and also to grant the board of commissioners the discretion to determine the size of that debt service rather than to mandate an inclusion of fifty percent. The purpose of the amendment was to grant such discretion in order to avoid the complications of the fifty percent requirement, such requirement and its legal complications preventing counties, at the time of the amendment, from selling bonds to provide funds for the construction of water and sewer lines.

Hence, according to the language and legislative history of R.C. 6117.02, the board of commissioners clearly has the power to directly inject debt service charges for construction costs into the computation of the total user charges.

Once again, appellees maintain that the allowance of the above practice is unreasonable, unusual, arbitrary, and inequitable. However, other jurisdictions have allowed the inclusion of debt service in situations similar to the present one. In Annotation, 61 A.L.R. 3d 1236, 1248-50, Municipalities — Sewer Use Rates, the author states the following:

"These [service charges] variously provide that the total annual sewer rental should be equal to the total operating costs * * * or sufficient to pay the cost of operation, repairs, maintenance, extension and enlargement of the system and improvements thereof, *new construction,* and the payment of revenue bonds and the interest thereon, and the like in even greater detail. * * * *Where the governing provisions expressly allow it,* sewer rates may validly be fixed to raise the funds necessary or reasonably calculated to pay for *construction* or acquisition of the sewer system or extensions or improvements of the system, and to amortise bonds issued for such purposes and pay the interest on such bonds. * * * * * * Rates are held not to be excessive merely because they are not limited to providing the cost of maintaining and operating the sewerage system." (Emphasis added.)

For example, in *Turley* v. *North Huntingdon Twp.* (1972), 5 Pa. Commw. 116, 289 A. 2d 509, the Commonwealth Court of Pennsylvania upheld a statutory scheme authorizing municipal authorities to charge rates to provide for sewer construction. Furthermore, in *Cramer* v. *San Diego* (1958), 164 Cal. App. 2d 168, 330 P. 2d 235, the Fourth District Court of Appeals of California upheld a statutory scheme which directed that the sewer service charges be paid into a fund used only for sewer system purposes, including "paying all or any part of the cost and expense of extending, constructing, reconstructing or improving the sewer system." In *Apodaca* v. *Wilson* (1974), 86 N.M. 516, 525 P. 2d 876, the Supreme Court of New Mexico upheld sewer user charges used for system costs, including

"maintenance, construction, enlargement and repair of the system facilities." *Apodaca, supra,* at 881.

This court, therefore, finds the inclusion of a sum for debt service as part of the total user charge to be permissible, and appellants' fourth assignment of error is found well taken.

On cross-appeal, appellees first assignment of error states the following:

"The trial court erred in holding that the board of commissioners had authority to maintain a trunk sewer down Sylvania Avenue (Sewer 500 C) within the City of Toledo and to regulate tapping thereof."

Since appellees failed to file a notice of appeal pursuant to App. R. 3 and 4, the above assignment of error is dismissed as not being properly before this court on appeal. A notice of appeal is required where an appellee seeks to modify a judgment in some respect, as appellees attempt to do in the instant case. *Parton* v. *Weilnau* (1959), 169 Ohio St. 145 [8 O.O.2d 134]; see, also, Koykka, Ohio Appellate Process 56, 57, Section 5.05 (1972).

On consideration whereof, the court finds substantial justice has not been done the party complaining, and judgment of the Common Pleas Court of Lucas County, Ohio, is affirmed in part and reversed in part. That part holding the tap-in charge improper for failure to make payment provisions prior to the tap-in is affirmed.

Those parts mandating the use of assessment procedures to recoup construction costs and prohibiting the inclusion of debt service amounts into the user fee are reversed. Therefore, the granting of appellees' motion for summary judgment on the basis that the board of commissioners failed to make payment provisions prior to the tap-in as required by statute is affirmed, while the granting of appellees' motion for summary judgment on the basis that appellants were statutorily prohibited from injecting a debt service amount into the user charge is reversed. The connection or tap-in charge of $250 is hereby rendered improper and invalid, while the inclusion of the sum for debt service as a part of the total user charge is rendered proper and permissible. This cause is remanded to the trial court for assessment of costs, costs to be equally divided between the parties.

*Judgment affirmed in part*
*and reversed in part.*

POTTER, J., concurs.

DOUGLAS, J., concurs in part and dissents in part.

POTTER, J., concurring. I concur in the judgment and as to the findings as to assignments of error Nos. I and II but for the following reasons. The initial opinion supports the trial court's finding that since the board made no payment collection arrangement prior to the tap-in of November 1978, such tap-in fee is improper under R.C. 6117.02. However, the record indicates that the proposed charge for a tap-in was originally made in June 1970, approximately eight years prior to the first connection. While the 1970 resolution was subsequently repealed in January 1978, and replaced by Resolutions 98, 99 and 100 establishing rates and charges, it is clear that such resolutions set forth a payment arrangement prior to the tap-in.

The initial opinion also relies upon the case of *Parente* v. *Day* (1968), 16 Ohio App. 2d 35 [45 O.O.2d 321], in finding such tap-in fee improper. The court in *Parente* held that tap-in charges were unlawful where such charges were not imposed until after the time of tap-in. However, in *Parente,* the property owners were apparently not aware that they would be subject to the tap-in charge until after the connection was made, while, in the instant case, the property owners were given notice of such tap-in fee by the resolutions of June 1970 and January 1978. Furthermore, while the

language of *Parente* is unclear, *Parente* apparently involved assessments and assessment procedures, while the instant case involves a one-time tap-in charge. Therefore, the *Parente* decision is not controlling in the instant case.

Turning to the aforementioned language in R.C. 6117.02, the statute states that "prior to such connection," such connection charges shall be either "paid in full" or provisions shall be made for "payment in installments." However, it is obvious from the clear words of the statute that the requirements that the tap-in fee be paid prior to connection to the system is for the benefit of the county. This requirement is designed to insure that the county has received its payment prior to the time that the user connects to the system. There is nothing in R.C. 6117.02 which suggests that the county loses the opportunity to collect a tap-in fee if it collects the fee subsequent to connection. If the county has, in fact, collected the fee subsequent to connection, the county has merely waived its right to receive payment prior to connection, but has not forfeited its right to receive the fee itself.

I find assignment of error No. I not well taken for the reasons hereinafter stated. The board tried to finance the initial construction of the sewer system in part by a connection fee. This connection fee was levied on every user in the district. There were no *old* or *new* users. The $250 charge was the same for those connecting in 1976 as for those who will connect in 1986. I quote the following from the stipulations of counsel:

"3. Said Resolutions provided that each single family residence thereafter connected to the Jerome Road Plant and its tributaries ('The System') would pay a one time charge called a tap-in charge, of Two Hundred Fifty Dollars ($250.00), to be used to recover part of the principal and interest on the outstanding debt incurred for the construction of The System, and authorizes the Lucas County Sanitary Engineer to collect said charges.

"* * *

"5. Said Two Hundred Fifty Dollar ($250.00) tap-in charge was not established as a percentage of the overall cost of The System and does not reflect any actual cost to Lucas County for the physical connection or 'tap-in' of a residence to The System.

"6. Said Two Hundred Fifty Dollar ($250.00) tap-in charge was established as a constant and unchanging amount; that is, those who connected in 1976 would be charged the same as those who connected in 1986, *i.e.,* Two Hundred Fifty Dollars ($250.00)."

The connection fee was not a charge for the "privilege of connecting" but in effect a flat charge against all improved property in the district connecting at the time of construction and thereafter. I do not find that this flat charge is reasonable, supported by the record, or lawful. Furthermore, it does not serve the purpose of a connection charge which is to "equalize the burden" between an old user and a new user. See *Amherst Builders* v. *Amherst* (1980), 61 Ohio St. 2d 345, at page 347 [15 O.O.3d 432]. Cf. *Airwick Indus., Inc.* v. *Carlstadt Sewerage Auth.* (1970), 57 N.J. 107, 270 A. 2d 18. See, also, *Rocky Hill Convalescent Hosp., Inc.* v. *Metropolitan Dist.* (1971), 160 Conn. 446, 280 A. 2d 344, wherein it is said that a connection charge is based on comparables for preceding years.

Except as modified by my observations above, I concur in the finding as to assignment of error No. II. However, I find that the trial court is not precise in its reference to "assessment" but was concerned primarily with procedure and the expenditure of funds accruing from the connection fee. I, therefore, find as did the trial judge, that a tap-in charge is not proper under the facts in the instant case. I concur in the finding as to the remaining assignments of error and in the judgment.

DOUGLAS, J., concurring in part and dissenting in part. I concur in finding appellants' second, third and fourth assignments of error well taken and in the dismissal of appellees' assignment of error.

I dissent with regard to the finding of the majority that appellants' first assignment of error is not well taken and for the following reasons would find the assignment of error well taken.

It is generally agreed that there is very little case law in the state of Ohio which directly (or even indirectly) decides or even discusses the various issues presented by the case now before us. For this reason the matter, for the most part, comes down to statutory interpretation and it is, therefore, possible and even probable that well-intentioned citizens, public officials, attorneys and judges, depending as much on their background, philosophy, experience and vested interest can and will come to different conclusions, all of which might be reasonable. This concurring judge is no different in that general respect, the only difference being that in keeping with our living in a society of laws passed by legislators and interpreted by judges, this decision and opinion is accorded more weight than is given to some others who might hold a position contra.

All elected officials and specifically (as they are involved in the case at bar) county commissioners are required by the Ohio Constitution (Section 7, Article XV) and the Revised Code (R.C. 3.22 and 3.23) to take an oath of office. In taking that oath the commissioners become generally responsible for the operation and functioning of the county. In addition to their general duties, they are required to carry out mandates imposed upon them by higher legislative authorities. Often these emanate from administrative agencies whose promulgation of rules and regulations has been given the force and effect of law by action of the legislature. Such is the situation in the case before us wherein the Ohio Environmental Protection Agency and the Ohio Board of Health made a finding by way of final administrative action that it was necessary to construct a trunk or main sewer in the county for sanitary purposes.

In facilitating county commissioners in carrying out these general and specific responsibilities, the legislature has enacted R.C. Chapter 6117. While it is true that R.C. 6117.30 and 6117.31 do provide a method for financing the expense of constructing sewers and treatment plants and that such method (assessment) has been the one traditionally used, it is also true that said sections do not provide the *only* procedure which may be employed for financing purposes. As argued by the parties and discussed in the opinion herein, R.C. 6117.02 includes language which may or may not be construed to provide capital construction cost recovery by implementing connection charges and/or rates for the use of sewers and treatment facilities.

I find R.C. 6117.02 to be clear in its language, its intent and its purpose. While admitting the quoting out of context of part of the provisions of R.C. 6117.02, nevertheless I do so not unfairly and thus I find that "the board of county commissioners shall fix reasonable rates * * * for the use of the sewers or sewerage treatment or disposal works * * *" and "* * * [t]he board shall also establish reasonable charges to be collected for the privilege of connecting to the sewers * * *" is clear authority for the commissioners to establish user fees and connection charges. Further I find that "* * * [a]ll moneys collected as rents for use of such sewers * * * or as connection charges * * * shall be paid to the county treasurer * * *" and "* * * such funds shall be used first for the payment of the cost of the management * * * and second for the payment of interest or principal of any outstanding debt incurred for the construction of such sewers * * *" to be authorization to expend such sums collected for, among other purposes, the

recovery or payment of construction costs. Therefore, I find that there *is* clear definitive language in R.C. 6117.02 to permit monies collected as connection charges (as well as user fees) to be used for the payment of interest or principal charges incurred for the construction of sewers and treatment facilities.

Having established the commissioners' authority, the only remaining question is whether or not the commissioners followed the procedures delineated in R.C. 6117.02 in levying a connection charge. The trial court found that the commissioners did not follow the proper procedures and this finding is the subject of appellants-commissioners' first assignment of error. I would find appellants' first assignment of error to be well taken.

In part, R.C. 6117.02 provides:

"* * * The *board shall also establish* reasonable charges to be collected for the privilege of connecting to the sewers or sewerage treatment or disposal works of the district *with the requirement* that, prior to such connection, such charges shall be paid in full * * * and no person shall be permitted to connect to the sewers or sewerage treatment or disposal works of the district until such charges have been paid in full * * *." (Emphasis added.)

On January 19, 1978, Commissioner Szollosi offered Resolution No. 98 and the same was passed with the concurrence of Commissioners Holzemer and Reddish. Those sections of that resolution that I find pertinent in deciding the question presented by appellants' first assignment of error are:

"Section 1. Definitions.

"(ff) 'Tap-In Charge' shall mean a charge established pursuant to this and previous Resolutions for purposes of collecting revenues for debt service payments."

"Section 10. Tap-In Charges.

"(a) Except in the case of property owned by Lucas County, no person * * * whatsover shall connect * * * either directly or indirectly with a sanitary sewer in the * * * District of Lucas County * * * without first receiving a permit for such purpose in a form prescribed by the Sanitary Engineer *and without first paying a tap-in charge determined in accordance with Section 10(b) hereof.*" (Emphasis added.)

"(b) The Sanitary Engineer shall not issue a permit * * * *until the applicant for such permit shall have paid a tap-in charge* to be determined in accordance with the following: * * * but not less than $250.00." (Emphasis added.)

"* * *

"(e) In the case of premises served by a package wastewater treatment plant which is thereafter connected to a sewer served by the Maumee River WWTP, *the tap-in charge established by this Section shall be payable at the time the wastewater is diverted from the package wastewater treatment plant* to a sewer served by the Maumee WWTP, and shall be paid by the owner of each building theretofore connected directly or indirectly to the package wastewater treatment plant." (Emphasis added.)

It is difficult to comprehend how the commissioners' intent could have been more clearly stated. The resolution speaks for itself and it complies with the mandates of R.C. 6117.02 which provides for the board to establish charges (see Section 10[b]) and to set forth a requirement that prior to any connection the charges shall be paid in full (see Sections 10[a], [b] and [e]). It should also be noted that this resolution was passed by the commissioners well before the June 1, 1978, date when the effluent from property owned by appellees was diverted into the county system.

Therefore, I find that the commissioners did comply with both the intent and the letter of the law as set forth in R.C. 6117.02.

In addition, I find two other matters persuasive. The provision in the statute

for the collection of a connection charge is for the benefit of the county in helping to amortize construction costs. Nowhere in the statute do I find a provision that if the county does not collect the connection charge before permitting tap-in, the county then has forever waived the right to collect the charge. If nothing else, logic dictates that the logistics of the construction of the new sewer and treatment plant, the disconnecting of properties being served by the package plant from the package plant, and the connecting of those same properties (whether it be through one connection or several) to the new sewer, requires an approach which is both systematic and has continuity, and to rule that the entire project be held hostage if one or more of the persons affected had not paid the charges in full *before* connection would seem to defy reason. Secondly, I find R.C. 6121.13 to be compelling authority in favor of the county proceeding as it has with the entire wastewater treatment system. The section provides for any governmental agency (the county) to cooperate with the Ohio Water Development Authority in any water development project and to "enter into such agreements with the authority as are necessary" and provide funds to carry out such agreements "by the levying of taxes, assessments, *or rentals and other charges* for the use of the utility system of which the water development project is a part * * *." It would seem that the county was well within its authority under several sections of the Revised Code to proceed as it has.

In today's world, public officials are given tremendous and often awesome responsibilities. Commensurate with those responsibilities there must be authority to meet the obligations imposed. If it is deemed that the authority is being abused, then the remedy is through the ballot box.

In the case before us, I find that the appellants met their responsibilities and did so within the confines of existing law.

I, therefore, concur in the judgment which finds appellants' second, third, and fourth assignments of error well taken and which dismisses appellees' assignment of error. In addition, I would find appellants' first assignment of error to be also well taken.