2008-NMCA-149

195 P.3d 1

**PROTECTION AND ADVOCACY SYS-TEM, Jane Does 1–3 and John Doe 1, Plaintiffs–Appellees,**

v.

**CITY OF ALBUQUERQUE, Defendant–Appellant.**

No. 27,199.

Court of Appeals of New Mexico.

Aug. 5, 2008.

Certiorari Denied, No. 31,301, Sept. 19, 2008.

Protection & Advocacy System, Rosemary L. Bauman, Nancy Koenigsberg, ACLU New Mexico, George Bach, Reber Boult, of Counsel, Law Office of Peter Cubra, Peter Cubra, Albuquerque, NM, for Appellees.

City of Albuquerque, Robert M. White, City Attorney, Gregory S. Wheeler, Assistant City Attorney, Peter H. Pierotti, Assistant City Attorney, Robert D. Kidd, Jr., Assistant City Attorney, Albuquerque, NM, for Appellant.

New Mexico Municipal League, Inc., Randall D. Van Vleck, General Counsel, Santa Fe, NM, for Amicus Curiae.

## OPINION

SUTIN, Chief Judge.

{1} In this case, we consider whether City of Albuquerque Ordinance C/S O–06–21, the Assisted Outpatient Treatment Ordinance (the Ordinance), is preempted by state law. First, though, we must consider whether Plaintiffs, Jane Does 1 through 3, John Doe 1, and Protection and Advocacy System (P & A), have standing to challenge the Ordinance. We agree with the district court that Plaintiffs have standing and that the Ordinance is preempted by the State Mental Health and Developmental Disabilities Code (the Code), NMSA 1978, §§ 43–1–1 to –25 (1976, as amended through 2007), and the Mental Health Care Treatment Decisions Act (the Act), NMSA 1978, §§ 24–7B–1 to –16 (2006). Thus, we affirm the district court's declaratory judgment and permanent injunction prohibiting the enforcement of the Ordinance.

## BACKGROUND

### I. The Ordinance

{2} The Ordinance became effective on October 6, 2006. It states:

> The City Council finds that there are mentally ill persons who are capable of living in the community with the help of family, friends and mental health professionals, but who, without routine care and treatment, may relapse and become violent, suicidal or require hospitalization. The City Council further finds that there are mentally[ ]ill persons who can function well and safely in the community with supervision and treatment, but who without such assistance, will relapse and require long periods of hospitalization. The City Council further finds that some mentally ill persons, because of their illness, have great difficulty taking responsibility for their own care, and often reject the outpatient treatment offered to them on a voluntary basis. Family members and caregivers often must stand by helplessly and watch their loved ones and patients decompensate.

Albuquerque, N.M., Ordinance C/S O–06–21, § 1 (Oct. 6, 2006).

{3} The Ordinance further indicates that the City Council believed that "assisted outpatient treatment" would be an "[e]ffective mechanism[]" to prevent the mentally ill from requiring hospitalization. *Id.* The Ordinance defines the following terms:

ASSISTED OUTPATIENT TREATMENT. Court ordered services prescribed to treat a person's mental illness and to assist a person in living and functioning in the community and/or to attempt to prevent a relapse or deterioration that may reasonably be predicted to result in harm to the person or another.

ASSISTED OUTPATIENT TREATMENT PROGRAM. A program that arranges and coordinates the provision of assisted outpatient treatment, including monitoring treatment compliance by patients, evaluating and addressing the conditions or needs of assisted outpatients and ensuring compliance with court orders.

. . . .

MENTAL ILLNESS. A substantial disorder of thought, mood or behavior that afflicts a person and that impairs that person's judgment but does not mean developmental disability.

. . . .

SUBJECT. A person who is alleged in a petition to the court to meet the criteria for [a]ssisted [o]utpatient [t]reatment.

*Id.* § 3.

{4} The Ordinance allows certain people to file "[a] petition for an order authorizing assisted outpatient treatment" in the Second Judicial District Court. *Id.* § 5(A). Those people include, but are not limited to, the subject's parent; the subject's spouse, adult sibling, or adult child; the director of a hospital where the subject is hospitalized; the director of an organization, agency, or home where the subject resides or from which the subject receives treatment; a qualified psychiatrist; a provider of social services; or the mayor. *Id.* Further:

The petition shall be accompanied by an affidavit from a physician, who shall not be the petitioner, and shall state that:

(1) The physician has personally examined the subject no more than ten days prior to the filing of the petition, that the physician recommends assisted outpatient treatment for the subject and that the physician is willing and able to testify in person or by telephone at the hearing on the petition; or

(2) No more than ten days prior to the filing of the petition, the physician or the physician's designee has made appropriate attempts to elicit the cooperation of the subject but has not been successful in persuading the subject to submit to an examination, that the physician has reason to suspect that the subject meets the criteria for assisted outpatient treatment and that the physician is willing and able to examine the subject and testify at the hearing on the petition.

*Id.* § 5(C).

{5} Under the Ordinance, a hearing shall be held on the petition. *See id.* § 6(B). If the subject has refused to be examined by a physician, then at the hearing,

the court may request that the [s]ubject consent to an examination by a court appointed physician. If the [s]ubject does not consent to an examination and the court finds that there are reasonable grounds to believe that the allegations in the petition are true, the court may order that a law enforcement officer take the [s]ubject into custody and transport the [s]ubject to a provider for examination by a physician. The examination may be performed by the physician whose affidavit accompanied the petition. No [s]ubject taken into custody pursuant to this section shall be detained longer than seventy-two hours.

*Id.* § 6(E).

{6} In order for the court to order assisted outpatient treatment, the court must find by clear and convincing evidence that the subject meets the following criteria.

(1) Is eighteen (18) years of age or older;

(2) Is suffering from a mental illness;

(3) Is unlikely to survive safely in the community without supervision, based on a clinical determination by a qualified mental health care professional;

(4) Has a history of lack of compliance with treatment for mental illness that has:

(a) prior to the filing of the petition, at least twice within the last thirty-six months[,] been a significant factor in necessitating hospitalization or receipt of services in a forensic or other mental health unit of a state correctional facility or a local jail facility, not including any period during which the person was hospitalized or incarcerated immediately preceding the filing of the petition; or

(b) prior to the filing of the petition, resulted in one or more acts of serious violent behavior toward self or others or threats of, or attempts at, serious physical harm to self or others within the last forty-eight months, not including any period during which the person was hospitalized or incarcerated immediately preceding the filing of the petition; and

(5) Is unlikely, as a result of mental illness, to voluntarily participate in the recommended treatment pursuant to the treatment plan; and

(6) In view of the person's treatment history and current behavior, is in need of assisted outpatient treatment in order to prevent a relapse or deterioration that would be likely to result in serious harm to himself or another person; and

(7) Will likely benefit from assisted outpatient treatment; and

(8) Is located within the municipal limits of the City.

*Id.* § 4(A).

{7} The examining physician must provide the court with a proposed written treatment plan. *Id.* § 7(A)(1). In developing the treatment plan, the physician "shall take into account, if existing, an advance directive," as well as allow the subject, the treating physician, and, upon request of the subject, an individual significant to the subject to have an opportunity to actively participate in the development of the plan. *Id.* § 7(B).

{8} In making its final disposition based on the petition, the court is:

authorized to order the [s]ubject to receive [a]ssisted [o]utpatient [t]reatment for a period not to exceed six months. In its order, the court shall state the [a]ssisted [o]utpatient [t]reatment that the [s]ubject is to receive. A court may order the [s]ubject to self-administer psychotropic drugs or accept the administration of such drugs by an authorized professional as part of an assisted outpatient treatment program. The order may specify the type and dosage range of such psychotropic drugs and shall be effective for the duration of the [s]ubject's assisted outpatient treatment. Assisted outpatient treatment may include one or more of the following categories:

(1) medication;

(2) periodic blood tests or urinalysis as medically necessary to determine compliance with prescribed medications;

(3) individual or group therapy;

(4) day or partial day programming activities;

(5) educational and vocational training or activities;

(6) alcohol or substance abuse treatment and counseling and periodic tests for the presence of alcohol or illegal drugs for persons with a history of alcohol or substance abuse;

(7) supervision of living arrangements; or

(8) any other services prescribed to treat the person's mental illness and to either assist the person in living and functioning in the community or to help prevent a relapse that may reasonably be predicted to result in suicide or the need for hospitalization; however, electro-convulsive therapy shall never be a form of treatment allowed by this ordinance.

*Id.* § 8(B).

{9} If an individual refuses to comply with the court-ordered treatment, then that person "may be retained for observation, care, treatment and further examination in the hospital for up to seventy-two hours to permit a physician to determine whether the patient has a mental illness and is in need of continued involuntary retention for care and treatment." *Id.* § 11(A). In order for such a detention to occur, a physician must determine that:

(1) the patient has failed or has refused to comply with the treatment ordered by the court;

(2) efforts were made to obtain compliance;

(3) the patient may be in need of involuntary admission to a hospital for immediate observation, care and treatment; and

(4) if the patient refuses to take medications or refuses to take or fails a blood test, urinalysis or alcohol or drug test as required by the court order, the physician may consider such refusal or failure when determining whether the assisted outpatient is in need of an examination to determine whether the patient has a mental illness for which hospitalization is necessary.

*Id.* A "provider" may transport the individual meeting the aforementioned criteria to an authorized hospital for observation, care, treatment and further examination, or a physician may "request the aid of a law enforcement officer to take the patient into custody and accompany the physician in transporting the patient to the hospital. . . . A law enforcement officer may carry out a provider's directive pursuant to this section unless otherwise prohibited by law." *Id.* § 11(B), (C).

{10} The Ordinance also addresses the representation of individuals who are the subject of a petition.

(A) Notice of a proceeding under this Ordinance shall be served on the [s]ubject of the petition, [P & A], and the Public Defender's Office Mental Health Unit if applicable.

(B) The [s]ubject shall be represented by counsel at all stages of the proceedings. When a subject has not retained his own attorney and is unable to do so, the court shall appoint counsel to represent him. When appointing counsel, the court shall give preference to nonprofit organizations offering representation to mentally ill and developmentally disabled persons.

*Id.* § 6.

## II. The Proceedings

{11} Before the Ordinance went into effect, Plaintiffs filed a complaint for declaratory and injunctive relief under the Declaratory Judgment Act, NMSA 1978, §§ 44-6-1 to -15 (1975). Plaintiffs requested the district court to declare that the Ordinance is preempted by the Code and the Act, and that, in enacting the Ordinance, the City exceeded the power granted to it under Article X, Section 6 of the New Mexico Constitution. Plaintiffs further requested the court to declare that the Ordinance violated other clauses of the New Mexico Constitution, including the Equal Protection Clause (Article II, Section 18), the substantive component of the Due Process Clause (Article II, Sections 4 and 18), the procedural component of the Due Process Clause (Article II, Section 18), as well as the right to be free from unreasonable searches and seizures (Article II, Section 10). Plaintiffs requested a permanent injunction enjoining the City from enforcing the Ordinance in its entirety.

{12} The City moved to dismiss the action arguing that Plaintiffs lacked standing. Plaintiffs filed a response, under seal, with affidavits attached by each of the four individual Plaintiffs. The affidavits stated facts relating to the criteria of the Ordinance. Specifically, each individual Plaintiff averred that he or she is eighteen or older, lives in Albuquerque, has been diagnosed with a mental illness and has a history of being noncompliant with prescribed treatment. Jane Doe 1 stated: "Currently, I sometimes choose not to take my prescribed medications and choose not to comply with other aspects of my recommended treatment plan." Each individual Plaintiff stated that he or she believed that persons specifically authorized by the Ordinance to petition for an order for assisted outpatient treatment may want him or her to comply with treatment with which he or she does not agree. Jane Doe 1 stated that her history of non-compliance with the recommendations of her treatment providers has been a significant factor in necessitating psychiatric hospitalization four times within the past thirty-six months, as well as having resulted in serious self-injurious violent behavior numerous times within the past forty-eight months. Each individual Plaintiff stated that he or she has engaged in at least one act or threat of serious self-injurious behavior in the past forty-eight months. All four

individual Plaintiffs averred that based on their history of mental illness, they may be deemed to be unlikely to survive safely in the community without supervision by a qualified mental health care professional, unlikely to voluntarily participate in a recommended treatment plan, in need of assisted outpatient treatment in order to prevent a relapse or deterioration that would be likely to result in serious harm to him—or herself or others, and likely to benefit from assisted outpatient treatment.

{13} Each individual Plaintiff also alleged that if the Ordinance were to take effect he or she would suffer irreparable harm. Each stated that he or she believed they would suffer a threat of irreparable injury if he or she became the subject of a petition for assisted outpatient treatment, including being taken into custody, being detained involuntarily, and being subjected to forced medication, blood and urine testing, and other invasive measures without consent. Does 1 through 3 further state that, since the passage of the Ordinance, they experienced an exacerbation of symptoms, including anxiety, depression, sleep difficulties, loss of appetite, stress-related headaches, crying spells, difficulty concentrating, nausea, feelings of shame and stigmatization, difficulty staying organized, and agitation.

{14} Additionally, Jane Doe 1 indicated that she completed a psychiatric advance directive in accordance with the Act, which detailed her mental health treatment choices and specified instructions in the event she should experience a future period of incapacity. She further stated that if she were the subject of a petition under the Ordinance she "would face the risk of being court-ordered to comply with a treatment plan that may be contrary to [her] express[ ] wishes, as set forth in [her] psychiatric advance directive."

{15} The district court addressed both the City's motion to dismiss and Plaintiffs' request for a permanent injunction on October 10, 2006. The court denied the City's motion to dismiss and concluded that all Plaintiffs have standing and granted Plaintiffs' request for a permanent injunction on the ground that the Ordinance is preempted by the Code and the Act. The district court did not ad-dress Plaintiffs' other constitutional arguments. The City of Albuquerque appeals.

## DISCUSSION

{16} The City argues that (1) neither the individual Plaintiffs nor P & A has standing to sue and (2) the Ordinance is not preempted by the Code or the Act. Applying *ACLU v. City of Albuquerque (ACLU II)*, 2008–NMSC–045, 144 N.M. 471, 188 P.3d 1222 (2008), and *ACLU v. City of Albuquerque (ACLU I)*, 1999–NMSC–044, 128 N.M. 315, 992 P.2d 866, we conclude that the individual Plaintiffs have standing. Applying *ACLU II*, *Forest Guardians v. Powell*, 2001–NMCA–028, 130 N.M. 368, 24 P.3d 803, and *New Mexico Right to Choose/NARAL v. Johnson (NARAL)*, 1999–NMSC–005, 126 N.M. 788, 975 P.2d 841, we conclude that P & A has standing. Finally, we conclude that the Ordinance is preempted because it conflicts with two general state laws, the Code and the Act, and because those state laws create a comprehensive scheme governing when a mentally ill individual can be subject to treatment without his or her consent.

## I. Standard of Review for Determining Issues of Standing

{17} Whether a party has standing to bring a claim is a question of law which we review de novo. *Forest Guardians*, 2001–NMCA–028, ¶ 5, 130 N.M. 368, 24 P.3d 803. Here, we are reviewing the denial of a motion to dismiss for lack of standing, under Rule 1–012(B)(1) NMRA, after affidavits have been presented to the court. We have found no New Mexico case stating the light in which we regard the factual allegations of the complaint under these circumstances. However, the United States Supreme Court has stated the standard as follows:

For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of [the] plaintiff's

standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Warth v. Seldin*, 422 U.S. 490, 501–02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citation omitted); *see Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir.2002) ("The attachment of exhibits to a [Fed.R.Civ.P.] Rule 12(b)(1) motion does not convert it to a Rule 56 motion. While the court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion[.]"); 2 James Wm. Moore, *Moore's Federal Practice* § 12.30[3], at 12–42 to –43 (3d ed.2008) (indicating the potential procedural postures raised by a motion to dismiss for lack of subject matter jurisdiction); *cf. Doe v. Roman Catholic Diocese of Boise, Inc.*, 121 N.M. 738, 742, 918 P.2d 17, 21 (Ct.App.1996) (stating that when ruling upon a motion to dismiss for lack of personal jurisdiction under Rule 1–012(B)(2), if the court, as a matter of discretion, decides the issue based on affidavits, "then the party asserting jurisdiction need only make a prima facie showing that jurisdiction exists" (internal quotation marks and citation omitted)). Thus, we accept as true all material allegations in the complaint and affidavits and construe them in favor of Plaintiffs. *See Forest Guardians*, 2001–NMCA–028, ¶ 5, 130 N.M. 368, 24 P.3d 803. To the extent that the City argues that the district court ruled the affidavits inadmissible and would not consider them, our reading of the transcript is that the court so ruled not on the issue of standing, but in the context of deciding the injunction based on the different evidentiary standard in Rule 1–066(A)(2) NMRA, which states that the court may accept "any evidence ... admissible upon the trial on the merits."

## II. Individual Plaintiffs Have Standing

{18} Standing is a judicially created doctrine designed to "insure that only those with a genuine and legitimate interest can participate in a proceeding." *De Vargas Sav. & Loan Ass'n v. Campbell*, 87 N.M. 469, 471, 535 P.2d 1320, 1322 (1975) (internal quotation marks and citation omitted); *see also ACLU II*, 2008–NMSC–045, ¶ 10, 144 N.M.

471, 188 P.3d 1222 (stating that a party requesting a declaratory judgment "must have a real interest in the question" (internal quotation marks and citation omitted)). To acquire standing, an individual

must demonstrate the existence of (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. In addition, the interest sought to be protected must be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

*Forest Guardians*, 2001–NMCA–028, ¶ 16, 130 N.M. 368, 24 P.3d 803 (internal quotation marks and citations omitted); *accord ACLU II*, 2008–NMSC–045, ¶ 10, 144 N.M. 471, 188 P.3d 1222; *cf. City of Las Cruces v. El Paso Elec. Co.*, 1998–NMSC–006, ¶ 16, 124 N.M. 640, 954 P.2d 72 (explaining the prerequisites of an "actual controversy" in a declaratory judgment action).

{19} The real debate between the parties in this case on individual standing is whether the individual Plaintiffs have demonstrated the first element of standing, an injury in fact. We briefly address the second two elements first, and then we turn our attention to the first element. It is clear to us that if the individual Plaintiffs can establish the alleged injury from being subjected to the Ordinance when it is preempted by state law, or that the Ordinance contains provisions which violate any of the individual Plaintiffs' constitutional rights, then there is a causal relationship between the passage of the Ordinance and the injury. Therefore, if the first element is met, the second element is met in this case. As for the third element, we also believe it is clear that if we affirm the permanent injunction against enforcing the Ordinance, then the alleged injuries will be redressed. We thus now turn to the issue of whether Plaintiffs have established an injury in fact.

{20} An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."

*Forest Guardians*, 2001–NMCA–028, ¶ 24, 130 N.M. 368, 24 P.3d 803 (internal quotation marks and citation omitted). This case requires us to consider the imminence of an injury. Federal case law has, on several occasions, considered whether an injury is imminent on the one hand or conjectural or hypothetical on the other. *See, e.g., City of Los Angeles v. Lyons*, 461 U.S. 95, 101–10, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). New Mexico, however, has only the cases of *ACLU I* and *ACLU II*. We must decide whether the facts of this case are closer to those in *ACLU I* or those in *ACLU II* in order to determine whether the individual plaintiffs have standing. In *ACLU I*, our Supreme Court held that certain plaintiffs, some of whom were minors, had standing to challenge a curfew ordinance even though none of the individual plaintiffs had been "stopped, taken into custody, cited or prosecuted for violation of the [c]urfew," and the plaintiffs did not allege that one of them would be arrested or charged for violating the curfew. 1999–NMSC–044, ¶¶ 6, 9, 128 N.M. 315, 992 P.2d 866. The Court stated:

> When contesting the constitutionality of a criminal statute, it is not necessary that [the plaintiff] first expose himself [or herself] to actual arrest or prosecution to be entitled to challenge [the] statute that he [or she] claims deters the exercise of his [or her] constitutional rights. When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he [or she] should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.

*Id.* ¶ 9 (alterations in original) (internal quotation marks omitted) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). The Court held that this credible-threat rationale sufficed to create standing despite the defendant's protests that none of the plaintiffs had been arrested, charged, or otherwise injured. *See id.* ¶¶ 8–9. The curfew ordinance permitted the arrest of a child who was out after curfew in a public place or on the premises of any establishment. *See*

*id.* ¶¶ 2, 14. The majority in *ACLU I* did not focus on a specific constitutional right, although it did refer to Article II, Section 10 of the New Mexico Constitution and to the concern about warrantless arrests. *See id.* ¶¶ 16, 23. As to standing, the Court focused on the existence of a credible threat of prosecution. *See id.* ¶¶ 8–9. *ACLU I* also held that the curfew ordinance was preempted by state law. *See id.* ¶¶ 1, 25.

{21} The Court in *ACLU II* continued to indicate that a credible threat of prosecution was a critical consideration. 2008–NMSC–045, ¶ 28, 144 N.M. 471, 188 P.3d 1222. In *ACLU II*, the executive director of the ACLU and the ACLU challenged an ordinance of the City of Albuquerque which would allow the City to seize the vehicle of an individual who has been arrested with no previous offenses, though not yet convicted, of driving while intoxicated (DWI). 2008–NMSC–045, ¶¶ 3–4, 6, 144 N.M. 471, 188 P.3d 1222. The Court in *ACLU II* found no "conduct 'arguably affected with a constitutional interest.'" 2008–NMSC–045, ¶ 27, 144 N.M. 471, 188 P.3d 1222. The Court also considered that, unlike the situation in *ACLU I*, the vehicle seizure ordinance "[did] not make illegal any particular course of conduct that was previously permitted." *Id.* Thus, the Court held that the plaintiffs had no injury.

{22} Significantly, the *ACLU II* Court also considered the question of imminence in distinguishing *ACLU I*. The Court reaffirmed *ACLU I* and stated the rule that a plaintiff can demonstrate an injury by showing that "he [or she] is imminently threatened with injury, or, put another way, that he [or she] is faced with a real risk of future injury as a result of the challenged action or statute." *Id.* ¶ 11 (internal quotation marks and citations omitted). The Court stated "[t]he plaintiffs in *ACLU I* could demonstrate that they themselves were highly likely to be arrested for violating the curfew if they stayed out past the time specified in the ordinance, simply by virtue of the fact that they were of a certain age." *ACLU II*, 2008–NMSC–045, ¶ 28, 144 N.M. 471, 188 P.3d 1222. Thus, the *ACLU I* plaintiffs had "establish[ed] an imminent injury or a real risk of injury to the particular plaintiffs." *ACLU*

II, 2008–NMSC–045, ¶ 28, 144 N.M. 471, 188 P.3d 1222. On the other hand, the *ACLU II* plaintiffs had not shown "a high likelihood" that the named plaintiff or any ACLU member would be either arrested for DWI or exposed to the threat of having his or her vehicle forfeited under the ordinance. *Id.* ¶ 29. The Court distinguished the circumstances in *ACLU II* from those in prior cases where "the threat of harm ... was real and significant and was directly traceable to the individual plaintiffs that were bringing suit[,]" whereas in *ACLU II* the plaintiffs only demonstrated "a general, undifferentiated threat of a hypothetical harm to some unidentifiable person." *Id.* ¶ 18.

{23} After considering *ACLU I* and *ACLU II*, we believe this case is more analogous to *ACLU I*. Here, the named individual Plaintiffs belong to a distinct group of individuals who have been diagnosed with a mental illness and who meet the criteria of Section 4 of the Ordinance. This certainly is as distinct a group as the teenage plaintiffs in *ACLU I*. Additionally, here, as in *ACLU I*, Plaintiffs challenged the Ordinance on the grounds that it is preempted by state law, and that it, among other things, violates their rights to be free from unreasonable searches and seizures. Given the similarities between *ACLU I* and the case at hand, we believe we are bound to apply *ACLU I*.

{24} The City argues, however, that there is an important distinction between the case at hand and *ACLU I*. The City argues that the Ordinance at issue in *ACLU I* did not require a "due process hearing before an arrest or detention," whereas under the Ordinance "no imminent threat of detention arises without the benefit of a hearing, at which time all constitutional and preemption issues can be raised." The City is correct and, in fact, a hearing is required before application of the Ordinance in any way at all. *See* Albuquerque, N.M., Ordinance C/S O–06–21, § 6. While the City accurately points to a distinction between the circumstances in *ACLU I* and the circumstances here, we are not persuaded that the circumstances to which the City points had any bearing on the reasoning of the Court in *ACLU I*. The concern in *ACLU I* was with subjecting an individual to judicial proceedings when the activity sought to be prohibited by the defendant was protected by state law. 1999–NMSC–044, ¶ 9, 128 N.M. 315, 992 P.2d 866. The words chosen by our Supreme Court in *ACLU I* were not that an individual should not be required to undergo a seizure before challenging the statute, but that the individual should not be required to undergo a "prosecution as the sole means of seeking relief." *Id.* (internal quotation marks and citation omitted). Here, the subject of a petition under the Ordinance would be required to undergo court proceedings as a means of seeking relief from application of the Ordinance. Given the language used in *ACLU I*, we do not believe that the City points us to a material distinction between *ACLU I* and the case at hand.

{25} Further, while not a criminal ordinance like the curfew ordinance in *ACLU I*, the Ordinance has a provision for taking an individual into custody if the individual has refused to be examined by a physician, as well as a provision for taking an individual into custody for an evaluation if the individual has refused to comply with court-ordered treatment and "may be in need of involuntary admission to a hospital for immediate observation, care and treatment[.]" Albuquerque, N.M., Ordinance C/S O–06–21, §§ 6(E), 11(A)(3). Thus, as in *ACLU I*, this case raises a significant liberty interest involving the constitutional right to be free from an unreasonable seizure. *See id.* § 11(A)(1), (4). Because the Ordinance in this case is capable of curtailing an individual's constitutional interest in being free from an unreasonable deprivation of liberty just as significantly as the ordinance did in *ACLU I*, we are bound to follow the reasoning therein.

{26} Applying *ACLU I* to the case at hand, and accepting the statements in the affidavits as true, each Plaintiff provided sufficient statements to demonstrate that he or she falls within the criteria of the Ordinance and thereby demonstrated a credible threat of application of the Ordinance. *See ACLU I*, 1999–NMSC–044, ¶ 9, 128 N.M. 315, 992 P.2d 866. Jane Doe 1 stated that she had been hospitalized four times in the last thirty-six months in part due to her

non-compliance with the recommendations of her treatment providers, thereby meeting the requirements of Section 4(A)(4)(a) of the Ordinance. Three of the individual Plaintiffs alleged an act of serious self-injurious violent behavior in the last forty-eight months, satisfying Section 4(A)(4)(b) of the Ordinance. All of the individual Plaintiffs alleged that based on their history, they may be deemed to be " 'unlikely to survive safely in the community without supervision' by a qualified mental health care professional." Section 4(A)(5) of the Ordinance requires that the subject be "unlikely, as a result of mental illness, to voluntarily participate in the recommended treatment pursuant to the treatment plan[.]" Each of the individual Plaintiffs alleged that he or she may be deemed unlikely to voluntarily follow a recommended treatment plan, and Jane Doe 1 alleged that she chooses not to take her prescribed medications and chooses not to comply with other aspects of her recommended treatment plan. This is comparable to the alleged intention to violate the curfew ordinance in *ACLU I. Id.* ¶ 9 ("When contesting the constitutionality of [an ordinance], it is not necessary [to] first expose [one]self . . . to actual arrest or prosecution to be entitled to challenge [the ordinance] that [one] . . . claims deters the exercise of [one's] . . . constitutional rights." (internal quotation marks and citation omitted)). Each of the individual Plaintiffs alleged that he or she meets the rest of the criteria of the Ordinance. Therefore, for all of these individual Plaintiffs there is a credible threat that someone will file a petition concerning them under the Ordinance.

{27} Given that the individual Plaintiffs have sufficiently alleged a credible threat, they have thereby alleged an imminent injury or risk of injury stemming from the enactment of the Ordinance, assuming the Ordinance is problematic, to demonstrate standing. In *ACLU I,* the plaintiffs argued that "their previously[ ]lawful activities during curfew hours [were] curtailed by the [c]urfew [o]rdinance." *Id.* ¶ 8 (internal quotation marks omitted). Similarly, here, the individual Plaintiffs alleged that an activity which is specifically protected by the Code, Section 43–1–15(A), and by the Act, Section 24–7B–4(A), namely, the right of a person, with capacity, to refuse medication is not protected by the Ordinance, under which a court order can require a person with capacity to take medication. Albuquerque, N.M., Ordinance C/S O–06–21, § 8(B)(1). In other words, Plaintiffs alleged that the previously lawful refusal of treatment is, under a court order requiring medication pursuant to the Ordinance, no longer lawful. Thus, given a credible threat of application of the Ordinance, we conclude that the individual Plaintiffs have sufficiently demonstrated standing to challenge the Ordinance.

{28} We note that the individual Plaintiffs also vigorously alleged standing based on mental distress they experienced directly related to the passage of the Ordinance. The individual Plaintiffs asserted that "they are experiencing current harm because the [O]rdinance's passage has caused exacerbation of the symptoms of their mental illnesses. These symptoms are affecting their lives now, on a day-to-day basis." (Emphasis omitted.) While we believe these allegations indicate the individual Plaintiffs may be experiencing an injury in some sense, the interest which a plaintiff alleges is violated must be one that is "entitled to some legal protection." *John Does I through III v. Roman Catholic Church of the Archdiocese of Santa Fe, Inc.,* 1996–NMCA–094, ¶ 17, 122 N.M. 307, 924 P.2d 273. We have not yet addressed whether the freedom from emotional distress due to the passage of an ordinance is a "legally protected interest." *Id.* However, we do not need to address this argument here because we conclude that the individual Plaintiffs have sufficiently demonstrated standing under the credible threat standard set forth in *ACLU I.*

### III. Organizational Standing

{29} The organization arguing that it has standing in this case, P & A, is a unique organization. Groups such as P & A are defined and, at least partially, funded by Congress. *See* 42 U.S.C. §§ 10801 to 10851 (1986, as amended through 2000). The groups or "systems" are state-based, can be private or public entities, *see* § 10805(c)(1)(B), and were created "to pro-

tect and advocate the rights of individuals with mental illness." § 10805(a). In creating protection and advocacy systems for the advocacy of individuals with mental illness:

(a) The Congress finds that—

(1) individuals with mental illness are vulnerable to abuse and serious injury;

. . .

(4) State systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate.

(b) The purposes of this chapter are—

(1) to ensure that the rights of individuals with mental illness are protected; and

(2) to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will-

(A) protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes; and

(B) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.

§ 10801. Thus, Congress vested protection and advocacy systems with "the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State[.]" § 10805(a)(1)(B).

▮ {30} In addition to individuals, we have held that an association (also referred to as an organization) may have standing.

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Forest Guardians,* 2001–NMCA–028, ¶ 21, 130 N.M. 368, 24 P.3d 803. In *ACLU II,* our Supreme Court continued the *Forest Guardians* test. *See ACLU II,* 2008–NMSC–045, ¶ 30, 144 N.M. 471, 188 P.3d 1222.

{31} Also in *ACLU II,* the Supreme Court reiterated the factors applied in *NARAL. ACLU II,* 2008–NMSC–045, ¶ 31, 144 N.M. 471, 188 P.3d 1222. In evaluating organizational standing, our Supreme Court in *NARAL* focused on

the following three criteria in determining the right of litigants to bring actions on behalf of third parties:

The litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

1999–NMSC–005, ¶ 13, 126 N.M. 788, 975 P.2d 841 (internal quotation marks and citation omitted). In *NARAL,* the plaintiffs were individual doctors who provided abortions to Medicaid-eligible women, an organization that provided abortions to Medicaid-eligible women, and an organization that provided counseling and referrals regarding abortions to Medicaid-eligible women. *Id.* ¶ 11. The plaintiffs sued the secretary of the New Mexico Human Services Department and others on behalf of Medicaid-eligible women who sought and were denied State funding for medically necessary abortions. *Id.* ¶¶ 1, 11. The Court held that the individual plaintiffs who provided abortions had standing to sue because they had "both a direct financial interest in obtaining state funding to reimburse them for the cost of these services, and a close relation to the Medicaid-eligible women whose rights they seek to assert in court[.]" *Id.* ¶ 14 (citations omitted). As for the organization, the Court held that it had a right to sue because it had standing to sue on behalf of its members who were Medicaid-eligible women and because "privacy concerns and time constraints impose a significant hindrance on the ability of Medicaid-eligible women to protect their own interest." *Id.*

{32} The special nature of protection and advocacy systems has been considered by various courts in determining whether the systems have standing in order to advance the claims of their members, or, as sometimes called, constituents. In particular, all parties in the present case rely on the case of *Doe v. Stincer*, 175 F.3d 879 (11th Cir.1999), which addressed whether an advocacy group had standing to sue Florida's attorney general, a hospital, and various doctors for an alleged violation of the Americans with Disabilities Act. In *Stincer*, the court applied the first two factors of the test this Court enunciated in *Forest Guardians*. Those factors are that, first, it is required that the association allege that at least one of its members is suffering from an injury or a threatened injury sufficient to establish standing for that member had the member brought the suit. Second, the interests sought to be protected by the association must be germane to the association's purpose. *Stincer*, 175 F.3d at 882. The court likened the protection and advocacy system involved to the statutorily created Apple Advertising Commission considered by the United States Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *Stincer*, 175 F.3d at 885 (citing *Hunt*, 432 U.S. at 344, 97 S.Ct. 2434). While the Apple Advertising Commission was not a membership organization, it was created to serve a specialized segment of the community, and those community members possessed "all the indicia of membership in an organization," including electing the Commission members and serving on the Commission. *Id.* (internal quotation marks and citation omitted).

{33} Following the same line of reasoning as that in *Hunt* and relating to the Apple Advertising Commission, *Stincer* held that the protection and advocacy system could sue on behalf of its constituents if it met the requirements for organizational standing. *Stincer*, 175 F.3d at 886. Just as in *Hunt*, the protection and advocacy system was statutorily created to advocate on behalf of a specialized segment of the population. *Stincer*, 175 F.3d at 886. Further, by statute, sixty percent of the advisory council membership and the chair of the council of a

protection and advocacy system must be " 'individuals who have received or are receiving mental health services or who are family members of such individuals.' " *Id.* (quoting § 10805(a)(6)(B), (C)).

■ {34} In line with the reasoning of *Stincer*, we see no bar, nor does the City argue one, to allowing standing even though P & A is an organization with constituents rather than members. In the same vein, and considering the second prong of the *Forest Guardians* test for organizational standing first, it is clear that the interests sought to be protected by P & A in this case are germane to the organization's purpose: "to ensure that the rights of individuals with mental illness are protected" and to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State[.]" §§ 10801(b)(1), 10805(a)(1)(B). Thus, P & A has satisfied the second prong of the *Forest Guardians* test to establish organizational standing.

{35} The aspect of organizational standing contested by the City is whether P & A has met the first prong of the *Forest Guardians* test, that is, alleging that one of its constituents would otherwise have standing to sue in his or her own right. The City cites *Stincer* and two other cases for the proposition that protection and advocacy groups have been denied standing if they have failed to show that their constituents have standing. *Stincer*, 175 F.3d at 887–88; *see also Tenn. Prot. & Advocacy, Inc. v. Bd. of Educ.*, 24 F.Supp.2d 808, 816 (M.D.Tenn.1998) (holding that the protection and advocacy group did not establish that it had standing to sue where it failed to name specific individuals who had suffered concrete harm); *Pa. Prot. & Advocacy, Inc. v. Houston*, 136 F.Supp.2d 353, 365–67 (E.D.Pa.2001) (denying standing to the protection and advocacy system because it had failed to "identify a specific constituent who is being harmed by the [d]efendant's actions").

{36} The cases upon which the City relies are distinguishable. In *Stincer*, the court held that the protection and advocacy system failed to allege facts showing that one of its

constituents had standing to sue. *Stincer*, 175 F.3d at 886–87. There, in order to establish standing, the system alleged that it had received complaints from individuals that they had been denied access to their medical records in violation of federal law. *Id.* at 887. However, the system failed to allege facts showing that those individuals were constituents of the system. *Id.* Here, however, P & A does not rely on unnamed individuals for standing and it is clear from the complaint that the named individual Plaintiffs are constituents of P & A because of the allegations that each suffers from mental illness. Thus, we are not persuaded by the City's reliance on *Stincer*.

{37} In the other two cases upon which the City relies, either there had been named individual plaintiffs, but those individuals' claims had become moot because the individuals received the remedy requested (in *Houston* ), or no individuals were ever identified or named as plaintiffs (*Tennessee Protection & Advocacy, Inc.*). *Houston*, 136 F.Supp.2d at 358; *Tenn. Prot. & Advocacy, Inc.*, 24 F.Supp.2d at 812. Thus, the only plaintiff remaining at the time of the opinions in those cases was the protection and advocacy system. Here, however, there are four Does identified and named as individual Plaintiffs, each having standing under *ACLU I* and each of whom is, by statutory definition, a constituent of P & A. *See* § 10801(b). As such, we find this case distinguishable from *Tennessee Protection and Advocacy* and from *Houston.* We conclude that P & A has met the first prong of the *Forest Guardians* test for organizational standing.

{38} Finally, as to the third *Forest Guardians* prong, 2001–NMCA–028, ¶ 21, 130 N.M. 368, 24 P.3d 803, that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," the United States Supreme Court retreated from requiring that an organization establish that prong in *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc. (United Food)*, 517 U.S. 544, 556–57, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). However, in both *ACLU II* and *Forest Guardians* the Courts set out the third prong, without mentioning the fact that the

United States Supreme Court no longer appears to rely on this requirement. *ACLU II*, 2008–NMSC–045, ¶ 30, 144 N.M. 471, 188 P.3d 1222; *Forest Guardians*, 2001–NMCA–028, ¶ 21, 130 N.M. 368, 24 P.3d 803. We tend to agree with *United Food*, but we nevertheless will apply this factor because our cases have included it as part of the test. *ACLU II* discussed it. As the Court determined in *Hunt*, we conclude that the third prong for organizational standing is satisfied in the present case because neither the claim asserted nor the relief requested "requires individualized proof." 432 U.S. at 344, 97 S.Ct. 2434. There is no need for individualized proof because the district court granted the injunction on the basis of an issue of law—preemption—which does not require an examination of facts specific to an individual. Thus, we hold that P & A has sufficiently established organizational standing under the *Forest Guardians* test.

{39} Additionally, we believe that P & A has demonstrated the existence of the factors applied by our Supreme Court in *NARAL*. *See NARAL*, 1999–NMSC–005, ¶ 13, 126 N.M. 788, 975 P.2d 841. *NARAL* discussed three factors, the first being that the litigant, in this case P & A, must have suffered an injury in fact giving it "a sufficiently concrete interest in the outcome of the issue in dispute." *Id.* (internal quotation marks and citation omitted). P & A points out that under the Ordinance the court shall appoint counsel to indigent subjects and that the court "shall give preference to nonprofit organizations offering representation to mentally ill ... persons." Albuquerque, N.M., Ordinance C/S O–06–21, § 6(B). P & A asserts that it is a nonprofit corporation charged with the duty of protecting and advocating for the rights of citizens with mental illness. *See* §§ 10801(b)(2), 10805(a)(1). P & A, however, rather than stating that it will represent persons who are the subjects of Ordinance petitions, states that due to limited funding it cannot guarantee it will provide services to individuals referred to it under the Ordinance. Nonetheless, under the Ordinance it appears that P & A will be appointed to represent indigent persons who are the subjects of Ordinance petitions. Upon appointment, P & A presumably will proceed to

represent a subject or protest the court-ordered appointment, thereby affecting P & A's financial interests by having to incur legal fees. *See NARAL*, 1999-NMSC-005, ¶ 12, 126 N.M. 788, 975 P.2d 841 (stating that the requirement of an injury "is met even when the extent of the alleged injury is slight"). Therefore, P & A has a financial interest in the proceedings to the same extent as the plaintiffs in *NARAL. See id.* ¶ 14 (concluding that "providers of abortion services to Medicaid-eligible women . . . have . . . a direct financial interest in obtaining state funding to reimburse them for the cost of these services").

{40} The other factors considered in *NARAL* are also present here: "a close relation to the third party; and . . . some hindrance to the third party's ability to protect his or her own interests." *Id.* ¶ 13 (internal quotation marks and citation omitted). Again, the statutory purpose of P & A is to protect and advocate the rights of individuals with mental illness, *see* §§ 10801(b)(2), 10805(a)(1), therefore establishing a close relationship between P & A and an individual with mental illness subject to a petition under the Ordinance. As to the hindrance of the third party's ability to protect his or her interests, protection and advocacy systems were created based on the belief that "individuals with mental illness are vulnerable to abuse and serious injury," § 10801(a)(1), with "abuse" defined to include "the use of bodily or chemical restraints on [an] individual with mental illness which is not in compliance with Federal and State laws and regulations." § 10802(1)(D) (footnote omitted). Without addressing whether the use of medications as treatment under the Ordinance is similar to the use of "chemical restraints" on an individual, we believe that the same vulnerability which Congress sought to remedy constitutes a hindrance to the ability of individuals with mental illness to protect their own interests when subject to a petition under the Ordinance. *See* § 10801(a)(1).

{41} Thus, we believe that under the standards applied in *ACLU II* and *Forest Guardians*, as well as under the factors of *NARAL*, P & A has standing to assert the rights of mentally ill individuals who are under a cred-

ible threat of being subject to a petition for assisted outpatient treatment under the Ordinance. Having concluded that all Plaintiffs have standing in this case, we now turn to the merits of the preemption claim.

## IV. Preemption

{42} The district court determined that the Ordinance is preempted by both the Code and the Act. The district court concluded that the Ordinance is in direct conflict with the Code and the Act. Further, the court concluded that the Code and the Act together create a comprehensive scheme governing individuals with mental illness which preempts the field by implication. The City contends that the district court erred because the Ordinance and the Code can be harmonized and argues that the district court incorrectly applied the law of preemption to the City as a home-rule municipality.

{43} Whether a municipal ordinance enacted by a home-rule municipality is preempted by state law requires us to construe together a constitutional amendment, the statutes, and an ordinance, which involves a question of law reviewed de novo. *NMFE*, 2006-NMCA-007, ¶ 11, 138 N.M. 785, 126 P.3d 1149. We construe constitutional amendments and statutes by first looking to the text of the amendment or statute and then turning to other indicators of the intent of the framers of the amendment or the Legislature if construing a statute. *Id.* The same rules of construction which apply to statutes apply to ordinances. *City of Rio Rancho v. Logan*, 2008-NMCA-011, ¶ 7, 143 N.M. 281, 175 P.3d 949.

{44} The general rule is that a municipality must look to the Legislature for an express or implied grant of authority in order to act. *State ex rel. Haynes v. Bonem*, 114 N.M. 627, 630, 845 P.2d 150, 153 (1992). However, a home-rule municipality, such as Albuquerque, is not subject to this general rule. *Id.* at 630–31, 845 P.2d at 153–54; *see Apodaca v. Wilson*, 86 N.M. 516, 519–20, 525 P.2d 876, 879–80 (1974) (stating that the City of Albuquerque is a home-rule municipality), *modification on other grounds recognized by Haynes*, 114 N.M. at 634, 845 P.2d at 157 Instead, home-rule municipalities are gov-

erned by Article X, Section 6 of the New Mexico Constitution, which states:

> D. A municipality which adopts a charter may exercise all legislative powers and perform all functions not expressly denied by general law or charter. This grant of powers shall not include the power to enact private or civil laws governing civil relationships except as incident to the exercise of an independent municipal power, nor shall it include the power to provide for a penalty greater than the penalty provided for a petty misdemeanor. . . .
>
> E. The purpose of this section is to provide for maximum local self-government. A liberal construction shall be given to the powers of municipalities.

"[T]he express purpose and liberal construction clauses make clear that the home rule amendment is intended to provide chartered municipalities with the utmost ability to take policymaking initiative." *NMFE*, 2006–NMCA–007, ¶ 16, 138 N.M. 785, 126 P.3d 1149.

{45} At issue in the present case is the Article X, Section 6(D) limitation on home-rule authority where a general law of the State expressly denies the municipality authority to act. N.M. Const. art. X, § 6(D); *see NMFE*, 2006–NMCA–007, ¶ 17, 138 N.M. 785, 126 P.3d 1149. There are additional limits expressed in Article X, Section 6(D); however, we need only address the general law limitation for the purpose of this case. N.M. Const. art. X, § 6(D); *see NMFE*, 2006–NMCA–007, ¶ 17, 138 N.M. 785, 126 P.3d 1149 (outlining the limitations expressed in Article X, Section 6(D)).

{46} We determine if a statute is a general law which expressly denies the municipality authority to act by using a two-step process. *Smith v. City of Santa Fe*, 2006–NMCA–048, ¶ 9, 139 N.M. 410, 133 P.3d 866, *aff'd*, 2007–NMSC–055, 142 N.M. 786, 171 P.3d 300. "In the first step, a court asks whether a state law is a general law, that is, a law that applies generally throughout the state, relates to a matter of statewide concern, and impacts inhabitants across the entire state." *Id.* (internal quotation marks and citation omitted).

While a general law supersedes a municipal charter or ordinance in conflict therewith, it should be borne in mind that the subject matter of the general legislative enactment must pertain to those things of general concern to the people of the state. A law general in form cannot, under the Constitution, deprive cities of the right to legislate on purely local affairs germane to the purposes for which the city was incorporated.

*Apodaca*, 86 N.M. at 522, 525 P.2d at 882 (internal quotation marks and citation omitted).

{47} In the second step, we ask whether state law expressly denies the City's power to enact the Ordinance in question. *See Smith*, 2006–NMCA–048, ¶ 10, 139 N.M. 410, 133 P.3d 866. However, we do not just look at whether the State has negated the City's power verbatim. *Haynes*, 114 N.M. at 634, 845 P.2d at 157. Rather,

> [t]his involves an inquiry into whether the [statute] evinces any intent to negate [the] municipal [legislative] power [at issue], whether there is a clear intent to preempt that governmental area from municipal policymaking, or whether municipal authority to act would be so inconsistent with the [statute] that the [statute] is the equivalent of an express denial.

*NMFE*, 2006–NMCA–007, ¶ 19, 138 N.M. 785, 126 P.3d 1149.

{48} Though *NMFE* sets out the inquiries listed as three separate inquiries, the purpose of all three is to determine legislative intent. *Id.; Smith*, 2006–NMCA–048, ¶ 10, 139 N.M. 410, 133 P.3d 866. To that end, the most basic inquiry used to determine whether the statute evinces an intent to negate the municipality from enacting a particular ordinance is whether the ordinance is inconsistent with state law. *See Casuse v. City of Gallup*, 106 N.M. 571, 573, 746 P.2d 1103, 1105 (1987). Thus, while "an ordinance may duplicate or complement statutory regulations," if the ordinance is inconsistent with a general State statute then the State statute controls. *State ex rel. Coffin v. McCall*, 58 N.M. 534, 538, 273 P.2d 642, 644 (1954) (internal quotation marks omitted); *see Bd. of Comm'rs of Rio Arriba County v. Greacen*,

2000–NMSC–016, ¶ 15, 129 N.M. 177, 3 P.3d 672 (stating that where there is a conflict between an ordinance and state law, the law of the sovereign controls); *Casuse*, 106 N.M. at 573, 746 P.2d at 1105 (same); *Gould v. Santa Fe County*, 2001–NMCA–107, ¶ 18, 131 N.M. 405, 37 P.3d 122 (same), *overruled on other grounds by Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003–NMSC–005, 133 N.M. 97, 61 P.3d 806. "The analysis to apply is whether the stricter requirements of the ordinance conflict with state law, and whether the ordinance permits an act the general law prohibits, or prohibits an act the general law permits." *Gould*, 2001–NMCA–107, ¶ 18, 131 N.M. 405, 37 P.3d 122 (internal quotation marks and citation omitted); *accord Greacen*, 2000–NMSC–016, ¶ 15, 129 N.M. 177, 3 P.3d 672.

{49} As an initial matter, we note that the City argues that the district court erred in applying the conflict analysis exemplified in *Casuse*, 106 N.M. at 573, 746 P.2d at 1105, claiming that this Court turned away from such an analysis in *Smith* and *NMFE*. In *Casuse*, our Supreme Court rejected the municipality's argument that it was free to "disregard an express law of the Legislature unless the law specifically states 'and no municipality may do otherwise.'" *Id.* Instead, the Court concluded that "when two statutes . . . conflict, the law of the sovereign controls." *Id.* The City misreads *Smith* and *NMFE*. In *Smith*, this Court favorably cited the *Casuse* Court's application of the conflict rule. *See Smith*, 2006–NMCA–048, ¶ 17, 139 N.M. 410, 133 P.3d 866 ("'[W]hen two statutes that are governmental or regulatory in nature conflict, the law of the sovereign controls.'" (quoting *Casuse*, 106 N.M. at 573, 746 P.2d at 1105)). In *NMFE*, we cited *Casuse* and, moreover, we devoted an entire section of the opinion to a conflict analysis and cited more recent cases which rely on the same conflict analysis set forth in *Casuse*. *NMFE*, 2006–NMCA–007, ¶¶ 19, 39–44, 138 N.M. 785, 126 P.3d 1149 ("The analysis to apply is whether the stricter requirements of the ordinance conflict with state law, and whether the ordinance permits an act the general law prohibits, or prohibits an act the general law permits." (internal quotation marks omitted) (quoting *Gould*, 2001–NMCA–107, ¶ 18, 131

N.M. 405, 37 P.3d 122)). Furthermore, even if we agreed with the City, we point out that *Casuse* is a case decided by our Supreme Court, and we are without the authority to decline to follow the reasoning therein. *State ex rel. Martinez v. City of Las Vegas*, 2004–NMSC–009, ¶ 20, 135 N.M. 375, 89 P.3d 47 (stating that the Court of Appeals is bound by Supreme Court precedent).

{50} We now turn to the application of the aforementioned law to the statutes and the Ordinance at hand.

## A. The Code Preempts the Ordinance

{51} We must decide whether the Code preempts the Ordinance. In order to do so, we first look at the language of the Code and the Ordinance.

{52} The Code provides that:

No psychotropic medication, psychosurgery, convulsive therapy, experimental treatment or behavior modification program involving aversive stimuli or substantial deprivations shall be administered to any client without proper consent. If the client is capable of understanding the proposed nature of treatment and its consequences and is capable of informed consent, his consent shall be obtained before the treatment is performed.

§ 43–1–15(A).

{53} The Code defines "client" to include "any patient who is requesting or receiving mental health services . . . or who is present in a mental health . . . facility for the purpose of receiving such services." § 43–1–3(B). In some places, the Code specifically refers to "resident clients," *see, e.g.,* § 43–1–6 ("Personal rights of residential clients."); § 43–1–7 ("Right to treatment."), whereas in others, the Code refers to a broader range of clients, as the Code does in Section 43–1–15(A).

{54} The Code has two exceptions to the informed consent requirement of Section 43–1–15(A). Under Section 43–1–15(B), a provider may petition the court for the appointment of a treatment guardian to make a substitute decision for the client if the provider believes that the client is incapable of informed consent. The court will only ap-

point a treatment guardian after significant procedural protections are employed. *Id.* The guardian must consider the client's wishes, best interest, and whether the treatment is the least drastic means for accomplishing the objective. *Id.* The guardian may then "apply to the court for an enforcement order" which allows for the administration of treatment without consent. *Id.* Significantly, this exception specifically addresses the procedure to be followed for outpatient clients: "If a client, who is not a resident of a medical facility and for whom a treatment guardian has been appointed, refuses to comply with the decision of the treatment guardian, the treatment guardian may apply to the court for an enforcement order." *Id.* This makes it clear that Section 43–1–15 governs outpatients as well as residential patients.

{55} The second exception to the rule that no psychotropic medication may be administered without consent allows a physician to administer medication without consent on an emergency basis if he or she "believes that the administration of psychotropic medication is necessary to protect the client from serious harm," while the provisions of Section 43–1–15(B) are being satisfied. § 43–1–15(F).

{56} As for the Ordinance, Section 8(B) authorizes a court to "order the [s]ubject to self-administer psychotropic drugs or accept the administration of such drugs by an authorized professional as part of an assisted outpatient treatment program." The Ordinance further allows for blood tests or urinalysis to determine whether the subject is taking the court-ordered medication, therapy, counseling, supervision of living arrangements, and more. Albuquerque, N.M., Ordinance C/S O–06–21, § 8(B). The Ordinance does not require that an individual lack capacity in order to be subject to the Ordinance. *See id.* § 4 (listing the criteria to be subject to a petition and order). Further, the Ordinance states that "[t]he determination by a court that a [s]ubject is in need of assisted outpatient treatment shall not be construed as or deemed to be a determination that the subject is incapacitated." *Id.* § 8(E). Thus, a person with capacity can be subject to a petition and order for outpatient treatment under the Ordinance.

{57} Having set out the pertinent provisions of the Ordinance, we now apply the law of preemption in order to determine whether Article X, Section 6 of the New Mexico Constitution authorizes the City to allow a court to order an individual to accept treatment without his or her consent. We must first consider whether the Code is a "general law." *Smith,* 2006–NMCA–048, ¶ 9, 139 N.M. 410, 133 P.3d 866. As in *NMFE,* we have no difficulty concluding that the statute is a general law because it concerns individuals with mental illness who are located throughout the State and thus the statute addresses issues of statewide, rather than local, concern. *See NMFE,* 2006–NMCA–007, ¶ 18, 138 N.M. 785, 126 P.3d 1149 (determining that the Minimum Wage Act is a general law because it is of concern to workers across the State).

{58} Next, we turn to an analysis of whether the Code expressly denies the City's authority to act. *See Smith,* 2006–NMCA–048, ¶ 10, 139 N.M. 410, 133 P.3d 866. The district court concluded that the Ordinance conflicts with Section 43–1–15 of the Code. Because we read the Ordinance to allow an act that Section 43–1–15(A) prohibits, we agree. *See Gould,* 2001–NMCA–107, ¶ 18, 131 N.M. 405, 37 P.3d 122. First, Section 43–1–15(A) states that "[n]o psychotropic medication ... shall be administered to any client without proper consent." If the client is incapable of giving an informed consent, then a treatment guardian must be appointed before any treatment can be administered without consent, regardless of whether or not the client is a residential client. § 43–1–15(A), (B). On the other hand, Section 8(B) of the Ordinance allows a court to order an individual to take medication or accept the administration of medication, even where the individual has the capacity and refuses to consent as defined in Section 43–1–15(A), thereby directly contravening the dictates of Section 43–1–15(A). *See also* Albuquerque, N.M., Ordinance C/A O–06–21, § 4 (outlining the criteria for an order under the Ordinance); *id.* § 8(E) ("The determination by a court that a [s]ubject is in need of assisted

outpatient treatment shall not be construed as or deemed to be a determination that the subject is incapacitated."). Additionally, the Ordinance does not require the appointment of a treatment guardian if an individual does lack the capacity to consent. Thus, Section 8(B) of the Ordinance allows an act which Section 43–1–15(A) forbids and is therefore preempted.

{59} The City argues that the Code and the Ordinance can be harmonized as follows: "The ... Code allows forced administration of medication on a subject only in the absence of capacity of the subject, while [the Ordinance] would allow the court to issue an order requiring the subject to comply with a treatment plan even if the subject has the mental capacity to make decisions." We are unable to discern how the City's reading of the Ordinance and the Code establishes that the two are in harmony. In sum, the City recognizes that the Ordinance allows a court to order a subject with capacity to comply with a treatment plan, which can include taking medication, to which he or she does not consent, and the Code prohibits the administration of medication absent consent except where the individual lacks capacity. The Ordinance and the Code are in conflict and cannot be harmonized because the Ordinance permits the court-ordered treatment of an individual with the capacity to make an informed consent, whereas Section 43–1–15(A) prohibits such an act. *See Gould,* 2001–NMCA–107, ¶ 18, 131 N.M. 405, 37 P.3d 122. Under these circumstances, the Code preempts the Ordinance. *Id.*

{60} The City next argues that we should apply the reasoning of the New York Court of Appeals in *In re K.L.,* 1 N.Y.3d 362, 774 N.Y.S.2d 472, 806 N.E.2d 480 (2004), in harmonizing the New York statute upon which the Ordinance is modeled with prior cases in New York holding that "a judicial finding of incapacity ... is required before an involuntarily committed patient may be forcibly medicated with psychotropic drugs against his or her will." *Id.,* 806 N.E.2d at 484. There, the court concluded that the assisted outpatient treatment statute "does not permit forced medical treatment" because "a violation of the [court] order, standing alone,

ultimately carries no sanction." *Id.* at 484, 485. The court noted that the statute stated that the "[f]ailure to comply with an order of assisted outpatient treatment shall not be grounds for ... a finding of contempt of court." *Id.* at 485 (internal quotation marks and citation omitted). The court, therefore, reasoned that "[t]he restriction on a patient's freedom effected by a court order authorizing assisted outpatient treatment is minimal, inasmuch as the coercive force of the order lies solely in the compulsion generally felt by law-abiding citizens to comply with court directives." *Id.* Thus, the court, which was addressing the argument that the statute violated due process, held that there was no due process violation because ultimately there was no consequence to the failure to comply with a court order requiring an individual to accept certain treatment. *Id.*

{61} Even, for the purpose of argument, were we to read the Ordinance to be consistent with the New York statute as to the absence of a sanction, for two reasons we conclude that the reasoning behind the New York court's due process holding cannot be applied in the context of the preemption analysis at issue in this case. First, the New York court was faced with a state statute that addressed assisted outpatient treatment, not an ordinance. *Id.* at 482. Consequently, the due process discussion in *In re K.L.* is not particularly helpful to our consideration of the separate issue of preemption, especially because the New York legislature had incorporated other, related mental health statutes into its assisted outpatient treatment statute. *See, e.g.,* N.Y. Mental Hygiene Law § 9.60 (1999) (incorporating references to other mental health provisions). When considering preemption, we must, above all, follow our Legislature's intent, which, as we discussed earlier in this opinion, is clearly that no person with capacity be treated without consent.

{62} Second, unlike the New York statute, the Ordinance does not state that the failure to comply with a court order will not result in sanctions. *See State ex rel. Apodaca v. Our Chapel of Memories of N.M., Inc.,* 74 N.M. 201, 204, 392 P.2d 347, 349 (1964) (discussing contempt and stating that "[t]he orderly pro-

cess of law demands that respect and compliance be given to orders issued by courts possessed of jurisdiction of the persons and of the subject matter and one who defies the order of a court having jurisdiction does so at his peril"). Further, regardless of whether there are sanctions in the Ordinance for failure to comply with court-ordered treatment, the coercive nature of a court order requiring treatment would clearly allow an act contrary to the statute's mandate that an individual's consent be obtained as long as the individual has capacity. Thus, we are not persuaded that the lack of sanctions in the Ordinance allows us to hold that the Ordinance is consistent with the Code and thus not preempted.

{63} Finally, we note that the City focuses on the underlying purpose of the Ordinance, arguing that this purpose is complementary to that of the Code and thus we should not conclude that the Code preempts the Ordinance. We recognize that both the City and the Legislature, through the Ordinance and the Code, respectively, have considered and in their own way have attempted to balance the interests of individuals in making their own mental health care treatment decisions, against the needs and desires of both the individual and the community for safety from violent episodes by individuals with mental illness. *See* Albuquerque, N.M., Ordinance C/S O–06–21, § 1 (stating that the purpose of the Ordinance is to address individuals with mental illness "who are capable of living in the community with the help of family, friends and mental health professionals, but who, without routine care and treatment, may relapse and become violent, suicidal or require hospitalization"); *N.M. Dep't of Health v. Compton*, 2001–NMSC–032, ¶ 12, 131 N.M. 204, 34 P.3d 593 (discussing, at length, the Code's balance of an individual's "significant liberty interest in being free from involuntary commitment" and the "compelling governmental interest of exercising its *parens patriae* power to protect individuals from themselves and its police power to protect society from dangerous individuals"). If there were not a conflict between the Code and the Ordinance, we would look to the purposes behind the Code and Ordinance in our analysis. *See Gould*, 2001–NMCA–107,

¶ 18, 131 N.M. 405, 37 P.3d 122 (summarizing the analysis as looking at both the purpose and effect of the statute and the regulation). However, when, as here, there is a conflict between state law and an ordinance, our focus is not on the consistency of the general intent and purpose behind the laws. *See id.* (pointing out that if there is a conflict between an ordinance and a statute, the statute controls and stating that an ordinance may be more restrictive than a statute unless it conflicts with the statute). Because we have found a conflict in this case, it would be improper for us to consider the City's arguments as to the goals of the Ordinance, regardless of whether we agree with the goals and the balance of those goals against the rights of individuals with mental illness. The beneficial purpose of the Ordinance cannot override a conflict in preemption jurisprudence.

## B. The Act Preempts the Ordinance

■ {64} Additionally, Plaintiffs argue that the Act preempts the Ordinance. The district court agreed.

{65} The Act allows an individual with capacity to give detailed instructions, in written or oral form, regarding his or her preferences for treatment should he or she become incapacitated. §§ 24–7B–4(A), –9(E). "Capacity" is defined as:

an individual's ability to understand and appreciate the nature and consequences of proposed mental health treatment, including significant benefits and risks and alternatives to the proposed mental health treatment, and to make and communicate an informed mental health treatment decision.

§ 24–7B–3(C). According to the Act:

[A] health care provider or mental health treatment facility providing care to a patient shall comply:

(1) before and after the patient is determined to lack capacity, with an individual instruction of the patient made while the patient had capacity;

(2) with a reasonable interpretation of the individual instruction made by a person

then authorized to make mental health treatment decisions for the patient; and

(3) with a mental health treatment decision for the patient that is not contrary to an individual instruction of the patient and is made by a person then authorized to make mental health treatment decisions for the patient, to the same extent as if the decision had been made by the patient while having capacity.

§ 24–7B–9(E). Exceptions to this requirement exist when:

(1) the treatment requested is infeasible or unavailable;

(2) the facility or provider is not licensed or authorized to provide the treatment requested; or

(3) the treatment requested conflicts with other applicable law.

§ 24–7B–9(F). Additional exceptions exist when the treatment requested would require "medically ineffective health care or health care contrary to generally accepted health care standards." § 24–7B–9(G).

{66} Under the Act, an advance directive for mental health treatment can include, for example, instructions on which medications an individual does or does not consent to take, how the medication can be administered, physicians by whom the individual does or does not consent to be treated, preferred treatment instead of hospitalization if feasible, instructions regarding the use of restraint and seclusion, instructions regarding the use of electroconvulsive therapy, and the appointment of an agent. *See* § 24–7B–7(E). Alternatively, an individual may execute a power of attorney for mental health treatment "that may authorize the agent to make any mental health treatment decision" for the individual should the individual become incapacitated. § 24–7B–4(B), (C).

{67} The Ordinance, on the other hand, allows the court to order treatment to which an individual does not consent if an individual meets the criteria in Section 4(A) of the Ordinance, whether or not the individual lacks capacity. *See* Albuquerque, N.M., Ordinance C/S O–06–21, § 4(A); *id.* § 8(E) (distinguishing a determination that outpatient assistance is appropriate from a determina-

tion that an individual is incapacitated). The Ordinance allows the court to order an individual to self-administer or accept the administration of treatment, including medication, by an authorized professional. *Id.* § 8(B). With regard to advance health care directives, the Ordinance requires the physician developing the treatment plan to "take into account" any advance directives. *Id.* § 7(B). Additionally, "the court shall take into account any advance directives or directions by the personal representative, agent, surrogate, guardian or individual designated by the person in determining the written treatment plan." *Id.* § 4(B). Finally, "[n]othing in this Ordinance shall preclude a person with an authorized representative from being subject to a petition for an order authorizing assisted outpatient treatment." *Id.* § 4(B).

{68} Applying the analysis set forth earlier in this opinion to determine whether the Ordinance is preempted by the Act, we first look to see if the Act is a general law. *Smith*, 2006–NMCA–048, ¶ 9, 139 N.M. 410, 133 P.3d 866. Again, we have no difficulty in concluding that the Act is a general law applicable throughout the State because it concerns how all New Mexicans with capacity can give instructions or execute a power of attorney in case the individual should in the future lack capacity to make mental health decisions. § 24–7B–4; *see NMFE*, 2006–NMCA–007, ¶ 18, 138 N.M. 785, 126 P.3d 1149 (concluding that the State minimum wage statute is a general law because it affects individuals throughout the State).

{69} Next, we look at whether the Act expressly denies the City power to enact the Ordinance. *Smith*, 2006–NMCA–048, ¶ 10, 139 N.M. 410, 133 P.3d 866. Again, because we conclude that the Ordinance allows an act that the Act forbids, we conclude that the Act preempts the Ordinance. *Gould*, 2001–NMCA–107, ¶ 18, 131 N.M. 405, 37 P.3d 122.

{70} The Act requires health care providers to comply with an individual's health care instructions, written or oral, made while the individual has capacity. § 24–7B–9(E). The Act also requires a physician to comply with the treatment decisions made by an individual's agent if the individual lacks capacity. *Id.*

This provision of the Act conflicts with and thereby preempts the Ordinance because the Ordinance allows a physician to not comply with (1) the oral or written treatment decisions of an individual with capacity, (2) the oral or written instructions given when an individual had capacity even where the individual currently lacks capacity, or (3) the treatment decisions made by an individual's appointed agent if the individual lacks capacity. *See* Albuquerque, N.M., Ordinance C/S O–06–21, §§ 4(B), 7(B), 8(B). The clear import of the Act is to require compliance with an individual's treatment decisions made while that individual has capacity. *See* § 24–7B–9(E). While the Ordinance requires the court to "take into account" advance directives when issuing an order for assisted outpatient treatment, it would nonetheless allow treatment contrary to that specified in advance directives because the Ordinance allows the court to order treatment to which an individual does not consent. Thus, the Ordinance allows a deviation from the requirement of Section 24–7B–9(E) that a physician honor the treatment decisions of an individual given while the individual has capacity, and therefore it allows an act that the Act forbids. Based on this conflict, the Act preempts the Ordinance.

## C. The Code and the Act Create a Comprehensive Scheme Preempting the Ordinance

{71} Additionally, we agree with the district court that the Code and the Act create a scheme so comprehensively regulating the area of treating individuals with mental illness, with or without the consent of those individuals, that the two state laws together preempt the City from enacting a separate ordinance regulating individuals with mental illness. *See ACLU I*, 1999–NMSC–044, ¶ 13, 128 N.M. 315, 992 P.2d 866. Through the Code and the Act the Legislature has evinced an intent to respect the treatment decisions of individuals made while they have capacity, and if the individual lacks capacity, then to provide the specific protections of both the Code and the Act before treating an individual with mental illness. It is the exceptional circumstance under which treatment can be required without consent.

*See* §§ 43–1–15, 24–7B–9(E). The Code details procedural protections which must be granted before an individual can be ordered by a court to accept treatment to which he or she does not consent, including a finding of incapacity· as well as the appointment of a treatment guardian. § 43–1–15(B). The Act goes into great detail to explain the extent to which an individual can give advance instructions for his or her treatment in the event that the individual subsequently becomes incapacitated and requires treatment providers to abide by those instructions. §§ 24–7B–4, –7, –9. The Code and the Act, therefore, are written expansively to cover all of the circumstances in which an individual can be required to take treatment to which the individual does not consent. To allow each municipality to create different schemes governing when and how individuals who do not consent to treatment can be required to accept treatment would frustrate the purpose of the Legislature in creating the detailed scheme in the Code and the Act. *See ACLU I*, 1999–NMSC–044, ¶¶ 13, 15, 128 N.M. 315, 992 P.2d 866 (determining that it would frustrate the intent of the Legislature to protect children to allow a municipality to criminalize behavior not criminalized by the comprehensive scheme created by the Children's Code). Thus, we hold that the Code and the Act together create a comprehensive scheme governing the circumstances by which an individual with mental illness can be required to accept treatment and together preempt the City in this case from enacting the Ordinance.

## D. Severability

{72} P & A argues that other parts of the Ordinance are also preempted. We do not find it necessary to review these arguments, however, because the effect of our conclusion that Section 8(B) is preempted is that the entire Ordinance is effectively preempted. This is so even though the Ordinance contains the following severability clause:

If any section, paragraph, sentence, clause, word or phrase of this [O]rdinance is for any reason held to be invalid or unenforceable by any court of competent

jurisdiction, such decision shall not affect the validity of the remaining provisions of this [O]rdinance. The Council hereby declares that it would have passed this [O]rdinance and each section, paragraph, sentence, clause, word or phrase thereof irrespective of any provision being declared unconstitutional or otherwise invalid.

Albuquerque, N.M., Ordinance C/S O–06–21, § 14.

{73} "[A] severability clause raises a presumption that the legislating body would have enacted the rest of the ordinance without the void section." *Chapman v. Luna,* 101 N.M. 59, 65, 678 P.2d 687, 693 (1984). While, as in *Chapman,* the severability clause in this case is "emphatic in its statement that the ordinance[ ] would have been enacted even if the invalid provision[ ] were not included," *id.,* here the invalidation of the relief available in the Ordinance in effect guts the entire Ordinance. The rest of the provisions of the Ordinance simply state the purpose of the Ordinance, define relevant terms, lay out the criteria for an order allowing treatment without consent, establish the procedure for such an order, and establish the parameters of such an order. *See generally* Albuquerque, N.M., Ordinance C/S O–06–21. These provisions serve no purpose once the provision allowing treatment without consent is invalidated.

{74} Because our holding is that a court cannot order that an individual accept treatment without consent as allowed in Section 8(B) of the Ordinance, the purpose of the rest of the sections of the Ordinance cannot be fulfilled. In effect, invalidating the relief allowed by the Ordinance in Section 8(B) invalidates the entire Ordinance. The City does not argue otherwise. We hold that the entire Ordinance is preempted.

**CONCLUSION**

{75} We conclude that Plaintiffs have standing to challenge the Ordinance. Further, the Ordinance is preempted by both the Code and the Act. We affirm the district court's permanent injunction against enforcing the Ordinance.

{76} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD, and CYNTHIA A. FRY, Judges.